297 Ga. 472
FINAL COPY

S15A0243.  RAI v. THE STATE.

HUNSTEIN, Justice.

Appellant Chiman Rai was convicted of murder, burglary, and related offenses in connection with the April 2000 death of his daughter-in-law, Michelle "Sparkle" Reid Rai.  Rai appeals his convictions and sentences on grounds of insufficiency of evidence, ineffective assistance of trial counsel, evidentiary error, and erroneous jury instructions.  Finding no error, we affirm.[1]

---

[1] Rai was indicted by a Fulton County grand jury in September 2006, together with co-indictees Cleveland Clark, Carl V. Clark, Herbert Green, and Willie Fred Evans.  All five men were charged with malice murder, two counts of felony murder, aggravated assault, burglary, possession of a knife during the commission of a felony, and criminal conspiracy to commit murder.  The State filed a notice of intent to seek the death penalty against Rai in October 2006.  The trial court thereafter granted Rai's motion to sever, and Rai was tried in June 2008.  Both Green and Evans testified at Rai's trial pursuant to plea agreements with the State.  The jury convicted Rai on all counts and, after finding the existence of numerous aggravating circumstances, recommended Rai be sentenced to life in prison without the possibility of parole.  The trial court thereupon sentenced Rai to life without parole for malice murder and a total of 25 consecutive years for burglary and weapon possession; the remaining counts merged or were vacated by operation of law.  Rai filed a timely motion for new trial on July 1, 2008, and, through new appellate counsel, amended his motion on November 22, 2011. Following evidentiary hearings held on July 9 and November 13, 2012, at which Rai's trial counsel testified, the trial court denied Rai's motion for new trial on January 10, 2014.  Rai filed a timely notice of appeal on February 10, 2014.  The appeal was docketed to the January 2015 term of this Court and was orally argued on February 17, 2015.

Viewed in the light most favorable to the jury's verdicts, the evidence adduced at trial established as follows. Sparkle married Rai's son, Rajeeve (then known as "Ricky") in March 2000, having given birth to the couple's daughter months earlier in October 1999. Rai, a native of India, did not approve of Ricky's relationship with Sparkle, an African-American woman whom Ricky met when she was employed as the front desk clerk at a Louisville, Kentucky hotel owned by the Rais. Rai did not attend the couple's wedding, nor has he ever met his granddaughter.

On the afternoon of April 26, 2000, Ricky returned from work to his Union City apartment to find Sparkle dead, having been stabbed and strangled in the presence of their infant daughter. There were no signs of forced entry, and nothing appeared to have been stolen from the apartment. Ricky had a credible alibi, and police were unable to identify any plausible suspects at the time. The case went cold.

In January 2004, the investigation was revived when Clinique Jackson, who had been arrested on unrelated charges, told Atlanta police that she had information regarding a murder in Atlanta. Jackson ultimately revealed to investigators that she and a friend, Jammie Tatum, had witnessed Sparkle's

2

murder.

Both Jackson and Tatum, who were teenagers at the time of the murder, testified that on the day of the murder they had been enticed by Tatum's cousin, Cleveland Clark, to accompany him to an apartment complex in Union City. Once at the apartment complex, Clark asked the girls to knock on the door of a particular apartment to see who was there. Jackson and Tatum reported to Clark that a woman was present with her baby. Clark then directed them to go back to the apartment and ask to use the bathroom; when they did, Clark followed, and, upon their entry into the apartment, Clark entered as well. Clark asked the victim if her name was Sparkle, and, after she responded affirmatively, he forced her to the floor, strangled her with the cord of a vacuum cleaner, and stabbed her repeatedly in the neck and chest. Clark made the girls promise to keep quiet about what they had seen. Later that day, after returning to Tatum's mother's home, Tatum picked up the phone and overheard Clark say that "it was done"; a male voice on the other end of the call responded, "okay, come on back."

Information from Jackson and Tatum led investigators to the discovery of three Western Union money transfers received by Clark in Atlanta in April 2000. The transfers were in the amounts of $400, $500, and $600 and were sent

3

by Willie Fred Evans from an address in Jackson, Mississippi on April 16, 19, and 24, respectively. Investigators contacted Evans, who led investigators to Herbert Green, also in Jackson, Mississippi. Green was a longtime friend and business associate of the Rai family, who also lived in Jackson, Mississippi.

Green testified at trial that Rai approached him in mid-April 2000 seeking help in having Sparkle killed. According to Green, Rai told him that "the girl was causing him some problems, and he needed the girl, he needed her killed." Green agreed to help and contacted Evans, who immediately contacted Clark. Clark agreed to do the job for $10,000. Rai gave Green a note with Ricky and Sparkle's Union City address and $1,500 in "up-front money," which Green gave to Evans, who then gave them to Clark. Clark departed for Atlanta that night.

On the following day, Evans testified, Clark called him to report that he had arrived at his aunt's Atlanta-area home. While in Atlanta, Clark called Evans numerous times to apprise him of his progress, reporting difficulty in accessing the couple's apartment because of the security gate at the entrance to the apartment complex. Evans confirmed that he wired money to Clark on three separate occasions during the approximately two-week period Clark was in

4

Atlanta.

On the day of the murder, Evans testified, Clark called him to report that he had two young women who "are going to get me inside the house" and that he intended to do it that day "before dark." Later that evening, Clark called back to report that he had completed the job and would be coming home the next day.

Telephone records reflected a series of phone calls occurring during the time period from April 14 through April 26, 2000, between a land-line registered to Evans' wife, Ruby, and various locations in and around Atlanta, including two phone numbers registered to Tatum's mother's Decatur residence. Among these calls were two collect phone calls from the Decatur residence to Ruby Evans' land-line, placed less than one hour after the time of the 911 call reporting Sparkle's murder.

During the investigation, Green agreed to meet and secretly record a conversation with Rai, during which Green told Rai that police had been questioning him about "the murder in Atlanta." The video recording of this meeting, which was played for the jury, reflects that Rai was not perplexed at the mention of the murder. At one point in the conversation, Rai stated, "well,

[if] we have to go to jail, we have to go."

In an effort to establish motive, the State adduced evidence that Rai and his wife desired their children to marry individuals of Indian descent, as is traditional in the Rais' native Punjabi culture. Trial testimony established that Ricky had unsuccessfully attempted to conceal from his parents his relationship with Sparkle; did not tell them of her pregnancy, which occurred just months after they began dating; and ultimately relocated with Sparkle to Atlanta without telling them of his whereabouts. When Ricky disappeared, Rai hired a private investigator to locate the couple; the investigator testified at trial that Rai told him he was concerned that Ricky's relationship with Sparkle might interfere with a marriage Rai was attempting to arrange at the time for another one of his children.

Also corroborating the State's theory of motive, Ricky told police in the immediate aftermath of the murder that his parents disapproved of his relationship with Sparkle, stating that "My parents are not exactly, you know, model citizens. You know, they're a little racist, to be honest with you." Though at trial Ricky attempted to disavow this statement as a lie he had told because he feared he was a suspect, he nonetheless testified that he had assumed

6

his parents would not approve of Sparkle because of her race and their expectation that he marry an Indian woman.

In addition to Ricky's statements, Sparkle's aunt, grandmother, and sister all testified at trial as to various statements Sparkle had made to them regarding Rai's disapproval of her due to racial and cultural differences. The State also adduced testimony from a neighbor of Ricky and Sparkle to the effect that Ricky had told him his parents "were upset that he married a black girl."

Finally, the State presented the testimony of Albert Walmer, who for several weeks shared a cell with Rai in the Fulton County Jail. Walmer testified that Rai had made several racist remarks while in jail and had inquired of Walmer how his father would feel if Walmer dated someone of another race.

1. The evidence as summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Rai was guilty of the crimes of which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); see also OCGA § 16-2-20 (b) (4) (defining a "party to a crime" as, inter alia, one who "[i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime"). Though Rai correctly points out that there was no physical evidence linking him to the murder, there

was unequivocal testimony from Green and Evans identifying Rai as the mastermind of Sparkle's murder. And while Rai assails the testimony and prior statements of both Green and Evans as riddled with inconsistencies, it is not for this Court to re-weigh evidence or resolve conflicts in testimony, as these are functions within the exclusive province of the jury. Vega v. State, 285 Ga. 32 (1) (673 SE2d 223) (2009). Moreover, key details of this testimony were corroborated both by the testimony of other witnesses — most notably, Jackson and Tatum — and the documentary evidence reflecting phone calls and money transfers among the co-conspirators. In addition, Rai's own statements and demeanor as depicted in his recorded conversation with Green are probative of his guilt, and the evidence of his disapproval of Ricky's relationship with Sparkle — and Rai's perception of the consequences of that relationship for his efforts to arrange marriages for his other children — supports a finding that he had the motive to commit the crime. The evidence was more than sufficient to support the verdicts.

2. Rai contends that the trial court erred in allowing Sparkle's aunt, grandmother, and sister to testify to various statements made by Sparkle regarding her relationship and interactions with Rai. Following a hearing on the

8

State's motion in limine at which these three witnesses testified, the trial court issued a detailed order holding much of the testimony proffered by the State to be inadmissible hearsay. The trial court did, however, identify a handful of Sparkle's specific statements to these individuals that the court deemed admissible under the necessity exception to the hearsay rule. The statements in question related to Rai's disapproval of Ricky and Sparkle's relationship due to racial and cultural differences; the Rais' desire to arrange Ricky's marriage; certain incidents involving Sparkle and Rai; and the fact that Sparkle and Ricky had moved to Atlanta in order "to get away from" the Rais.[2]

Under the rules of evidence applicable at the time of Rai's trial, hearsay statements were admissible under the necessity exception only if such evidence was deemed "'necessary'" and the statements bore "'particular guarantees of trustworthiness.'" Chapel v. State, 270 Ga. 151, 155 (4) (510 SE2d 802)

---

[2] We note that Rai assigns error not to any testimony actually adduced during the trial but rather to the statements designated as admissible in the trial court's pre-trial order. To the extent the trial court erred in ruling admissible at the pre-trial stage any statements that were not ultimately adduced at trial, any such error would be moot at this point in the proceedings. As Rai has failed to specifically pinpoint the testimony actually adduced at trial that he deems to have been erroneously admitted, we would be authorized to treat this enumeration as abandoned. We nonetheless have reviewed the merits of this enumeration.

(1998); see also former OCGA § 24-3-1 (b).[3] To establish "necessity," the proponent of the evidence must show both the unavailability of the declarant due to death or some other cause and the materiality of the statement in question, in that "the statement is relevant to a material fact and . . . more probative on that material fact than other evidence that may be procured and offered." Chapel, 270 Ga. at 155; accord Paul S. Milich, Ga. Rules of Evidence, § 19:32, at 832 (2014-2015 ed.). To establish "trustworthiness," the proponent must demonstrate that "'the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility.'" Chapel, 270 Ga. at 155; Milich, § 19:32, at 837. Trustworthiness is assessed under the totality of the circumstances, including any motives the declarant may have had to be untruthful in making the statement; the consistency of the statement with other statements made by the declarant; and the extent to which the declarant enjoyed a relationship of confidence with the witness. Chapel, 270 Ga. at 155-156; Milich, § 19:32, at 835-836. The trial court's determination as to the applicability of the necessity exception should be affirmed absent an abuse of discretion. See Thomas v. State, 274 Ga. 156 (8) (549 SE2d 359)

[3] The necessity exception is now found at OCGA § 24-8-807.

(2001).

The trial court did not abuse its discretion here. It is undisputed that Sparkle was unavailable to testify. The statements in question were undeniably relevant to the critical issue of motive, in that they were indicative of the nature of, and reasons for, Rai's disapproval of Sparkle and Ricky's relationship with her. The statements were more probative on this point than any other evidence the State could procure: Rai himself did not testify; Rai's wife exercised her spousal privilege not to testify; and Ricky, in his trial testimony, disavowed any racial or cultural bias on the part of his father, as did Ricky's siblings. The nature and extent of Rai's negativity toward his daughter-in-law were essential to explaining Rai's motivation in orchestrating her murder.

Finally, the statements bore sufficient indicia of trustworthiness, in that they were made to family members who each shared a close and confidential relationship with Sparkle: her aunt, with whom Sparkle lived at the time she met and began dating Ricky and who described her relationship with Sparkle as akin to that of "girlfriends"; Sparkle's grandmother, who had lived with Sparkle at various points during Sparkle's childhood and saw her virtually every day during Sparkle's stint in Louisville; and Sparkle's younger sister, with whom

Sparkle discussed personal matters on a regular basis. See, e.g., Faircloth v. State, 293 Ga. 134 (3) (744 SE2d 52) (2013) (victim's statements to sons and a colleague in whom she regularly confided were admissible under necessity exception); Mathis v. State, 291 Ga. 268 (3) (728 SE2d 661) (2012) (victim's statements to his friend, who testified he was a confidant of and mentor to victim, were admissible under necessity exception); Mills v. State, 287 Ga. 828, 831 (3) (700 SE2d 544) (2010) (victim's statements to sister, with whom victim was "real close," were admissible under necessity exception). Given that disharmony with Rai, the father of the man Sparkle loved, was likely to be an upsetting topic, there was no apparent motive for Sparkle to lie about the issue. Additionally supportive of the statements' reliability is the fact that the statements to all three witnesses were consistent with one another, and there was no evidence that Sparkle ever contradicted herself in speaking of her relationship with Rai or recanted or refined her views on this issue over time. Compare Mallory v. State, 261 Ga. 625 (2) (409 SE2d 839) (1991) (victim's statement to friend deemed insufficiently reliable to qualify under necessity exception where victim had made contradictory statement to another witness). Under the totality of the circumstances, the trial court did not abuse its

discretion in admitting Sparkle's hearsay statements.

3. Rai next contends that Walmer's testimony regarding Rai's jailhouse statements should have been suppressed as the product of a Sixth Amendment violation. Specifically, Rai contends that Walmer was acting as an agent of the State in his jailhouse interactions with Rai and that, therefore, the statements Rai made in Walmer's presence constituted the fruits of an uncounseled interrogation under Massiah v. United States, 377 U. S. 201 (84 SCt 1199, 12 LE2d 246) (1964) and its progeny. "Under [Massiah], the right to counsel is violated by the admission of incriminating statements which a government agent deliberately elicits after indictment and in the absence of counsel." Higuera-Hernandez v. State, 289 Ga. 553, 554 (2) (714 SE2d 236) (2011).

A jailhouse informant may be considered a government agent in this context where he "was acting under the instructions of [the] government." Baxter v. State, 254 Ga. 538, 546 (12) (331 SE2d 561) (1985). See, e.g., United States v. Henry, 447 U. S. 264 (II) (100 SCt 2183, 65 LE2d 115) (1980) (jailhouse informant who was paid for eliciting incriminating statements from defendant after his arrest and indictment was government agent, and defendant's statements to him were inadmissible as fruits of interrogation conducted in

violation of Sixth Amendment right to counsel). Specifically, an informant may be classified as a government agent only if there is both (1) an agreement between the informant and government authorities to exchange incriminating information for payment, lenient treatment, or some other benefit and (2) some action by the informant designed deliberately to elicit incriminating information. Higuera-Hernandez, 289 Ga. at 556-557. Thus, "[a]n inmate who acts upon the expectation of an unpromised reward does not thereby become an agent for the state." Baxter, 254 Ga. at 546; accord Burgan v. State, 258 Ga. 512 (5) (371 SE2d 854) (1988).

Here, the trial court held a pre-trial hearing to determine the admissibility of Rai's statements to Walmer. The testimony reflected that Walmer — who had been arrested for forgery and check fraud, had pled guilty, and was subject to an arrest warrant in Florida in connection with other crimes — approached law enforcement officials at his extradition hearing with information about Rai, with whom Walmer had been sharing a jail cell. In an interview with detectives, Walmer recounted various remarks Rai had made about his case, about African-Americans, and about interracial dating. Though Walmer did during this conversation inquire about the status of some cash that police had seized from

14

him at the time of his arrest, the detectives made no promises and offered no special assistance in this regard. In addition, the detectives counseled Walmer specifically not to question Rai about his case upon Walmer's return to the jail. More than a week later, after Walmer's extradition to Florida, Walmer contacted officials by phone with additional information he had obtained from Rai. All three detectives who interviewed Walmer testified unequivocally that Walmer himself initiated all contacts with them; that they did not instruct Walmer to get information from Rai or request that he do so; and that they made no promises and offered no benefits in exchange for information regarding Rai.

Under these circumstances, the trial court properly determined that Walmer's contacts with Rai gave rise to no Sixth Amendment violation. Walmer was clearly the initiator of all communications with law enforcement officials, no agreements or promises were made in connection with obtaining information from Rai, and the detectives affirmatively advised Walmer not to question Rai or attempt to elicit information from him. Contrary to Rai's contention, Walmer's inquiries regarding the status of his seized property reflect, at most, "the expectation of an unpromised reward," which does not by itself transform a jailhouse informant into a government agent in this context.

15

See Burgan, 258 Ga. at 515; Baxter, 254 Ga. at 546.  This enumeration, thus, is without merit.

4.    Rai next contends that the trial court erroneously allowed two witnesses to testify regarding prior statements Ricky had made regarding his parents' sentiments about his relationship with Sparkle.  Sparkle's aunt, Ctoria Arnold, was asked on direct examination whether Sparkle had ever told her that Rai "did not want her and Ricky Rai together because of cultural differences, and that Ricky Rai had a prearranged marriage."  Arnold responded, "[Sparkle] and Rick both told me that."  Defense counsel objected on hearsay grounds to the response as it related to Ricky, and the trial court overruled the objection.  Even assuming arguendo that the objection was valid, any error would have been harmless given that the statement was also attributed to Sparkle.

The second witness to testify to a prior statement by Ricky was Benton Douglas, Sparkle and Ricky's neighbor, who testified that Ricky had told him that his parents "were upset that he married a black girl."  As there was no objection to this testimony, Rai has failed to preserve the issue for appellate review.  See Spickler v. State, 276 Ga. 164, 166-167 (5) (575 SE2d 482) (2003) ("[i]n order to preserve an issue for appellate review, there must be a

16

contemporaneous objection made on the record at the earliest possible time").

5. Rai also assigns error to the admission of certain testimony by a detective who interviewed Ricky on the ground that it constituted a comment by the detective on Ricky's credibility, a matter for the jury's determination. Specifically, the detective was permitted to testify that, in interviewing Ricky, he never asked Ricky to make any assumptions about the subjects discussed in the interview, and Ricky never expressed that any of his statements were based on assumptions. We conclude that this testimony, which was adduced in direct response to Ricky's disavowal of statements he made during the interview,[4] was not a comment on Ricky's credibility but rather an attempt to impeach Ricky's trial testimony. The trial court therefore did not err in allowing the testimony.

6. Rai next contends that the trial court erred in allowing the prosecutor to ask Green on direct examination whether, in his secretly recorded conversation with Rai, Rai appeared to know what Green was talking about when he referred to "the murder in Atlanta." We disagree, insofar as "[a] lay witness may relate his or her opinion as to . . . any fact so long as the opinion is

---

[4] Specifically, Ricky maintained in his trial testimony that his earlier description of his parents as racist had been founded on assumptions he had since rejected as false.

17

based upon the person's own experiences and observations." Harris v. State, 279 Ga. 304, 306 (1) (612 SE2d 789) (2005). Here, Green was merely asked to assess Rai's understanding of the topic of their conversation based on Green's own observations of Rai's behavior and demeanor at the time. See id. There was no error in the admission of this testimony.

7. Rai next assigns error to the exclusion of testimony that the defense proffered from a character witness regarding a specific act of charity by Rai in relation to a poor African-American customer of the grocery store Rai owned. Rai contends that the exclusion of this evidence, offered to rebut the evidence of Rai's past statements expressing racial bias, impeded his right to present a complete defense. However, we have made clear that a defendant

> may produce evidence of his good character in two ways. He may take the stand himself and testify as to his past good conduct, or . . . he may call third parties to testify as to his general reputation in the community. He may not, however, call third parties to testify to specific acts of past good conduct either to refute [other] evidence or to introduce evidence of his good character.

Boyce v. State, 258 Ga. 171, 172 (1) (366 SE2d 684) (1988). Accord Banta v.

State, 282 Ga. 392 (4) (651 SE2d 21) (2007).[5]   Accordingly, the trial appropriately exercised its discretion in excluding this testimony.

8. Rai also contends that the trial court erred in its jury instruction as to the resolution of conflicts in witness testimony.  As Rai's trial counsel acknowledged, the charge given substantially tracked the language of the pattern jury instruction on this issue in effect at the time.  See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.31.20 (4th ed. 2007, updated Jan. 2008).  Moreover, there was no error

> in charging the jury that it should attempt to reconcile conflicting testimony without ascribing false statements to any witness, but that, if it cannot do that, it must determine which witnesses are best entitled to be believed and which are not.  The charge was not a "presumption of truthfulness" charge.  The jury instruction did not require that the jury believe the testimony of any witness, whether impeached or unimpeached.

Smith v. State, 292 Ga. 588, 590 (3) (740 SE2d 129) (2013).  Accordingly, the charge given here did not invade the province of the jury to assess witness credibility or improperly shift the burden of proof.  See id. (finding no error in

---

[5] The admission of character evidence is now governed by OCGA §§ 24-4-404 and 24-4-405.

giving of jury instruction tracking that in former § 1.31.20).

9.  Finally, Rai contends that his trial counsel rendered constitutionally ineffective assistance.  See Bowling v. State, 289 Ga. 881, 889 (5) (717 SE2d 190) (2011) (under Strickland v. Washington, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984), to establish ineffective assistance the defendant must show "that his trial counsel's performance was professionally deficient and that, but for such deficient performance, a reasonable probability exists that the outcome of the trial would have been different").

(a)  Rai first claims that trial counsel performed deficiently in failing to object to the admission of Sparkle's hearsay statements to the extent that they expressed her opinions regarding Rai's racial and cultural bias, because there was no foundation laid as to the basis for Sparkle's opinions in this respect. While it is undisputed that trial counsel did not assert this particular objection to the testimony in question, we find no deficient performance in this regard given trial counsel's vigorous efforts to exclude the totality of Sparkle's hearsay statements as ineligible for admission under the necessity exception.  These efforts were successful in large measure and greatly narrowed the scope of the hearsay evidence that was ultimately admitted at trial.  Moreover, even assuming

20

arguendo that Sparkle's opinion regarding the basis for Rai's disapproval was improperly speculative, Rai cannot establish prejudice from this testimony insofar as it was cumulative of other evidence the State adduced regarding Rai's racial and cultural bias, including, but not limited to, the damning testimony by Walmer.

(b) On similar grounds, Rai complains of trial counsel's failure to object to testimony by Ricky as to his father's racism and desire for his children to have traditional Indian marriages. We find no deficient performance or prejudice, insofar as Ricky's opinion in this regard "was a mental deduction from facts which were within [his] knowledge . . . and to which [he] testified." Peebles v. State, 260 Ga. 430, 432 (3) (396 SE2d 229) (1990). And even assuming arguendo this testimony was improper, there was no prejudice insofar as (1) Ricky attempted in his testimony to disavow his past characterizations of his father as racist and (2) this evidence was cumulative of other testimony regarding Rai's racist beliefs. See White v. State, 273 Ga. 787 (4) (546 SE2d 514) (2001) (erroneous admission of hearsay held harmless where cumulative of other properly admitted evidence).

Judgment affirmed. All the Justices concur.

Decided July 6, 2015.

Murder. Fulton Superior Court. Before Judge Bedford.

<u>Law Firm of Shein & Brandenburg, Elizabeth A. Brandenburg</u>, for appellant.

<u>Paul L. Howard, Jr., District Attorney, Paige Reese Whitaker, Lori L. Canfield, Assistant District Attorneys; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Vicki S. Bass, Assistant Attorney General</u>, for appellee.