304 Ga. 616
FINAL COPY

S18A0979.  BISHOP v. THE STATE.

BETHEL, Justice.

Following appellant Harold Bishop's third trial for the murder of his wife, Sherry Bishop, he was convicted of felony murder and has filed this appeal.[1] His single claim of error is that the trial court erred in admitting certain statements made by the victim under the necessity exception to the rule against hearsay contained in our old Evidence Code.  See former OCGA § 24-3-1.  For the reasons that follow, we find no error and affirm.

---

[1] The crime occurred on January 21, 1996.  Appellant was initially convicted of the felony murder of Sherry on September 12, 1997.  This Court, however, reversed his conviction due to the trial court's refusal to give a requested charge on the burden of proof.  *Bishop v. State*, 271 Ga. 291, 291-292 (2) (519 SE2d 206) (1999).  The State retried appellant, but on March 21, 2001, the trial court granted a mistrial due to the inability of the jury to reach a verdict.  Appellant was again tried for the felony murder (with aggravated assault as the underlying felony) and aggravated assault of Sherry and was found guilty on September 4, 2002.  The trial court sentenced appellant to life in prison for felony murder and merged the aggravated assault count with the felony murder count for purposes of sentencing.  Trial counsel filed a motion for new trial on September 9, 2002.  On June 25, 2007, appellate counsel was appointed for appellant.  On September 18, 2017, that counsel filed an amended motion for new trial.  That same day, the trial court summarily denied the motion for new trial, as amended.  On October 16, 2017, appellant filed a notice of appeal, and the case was docketed in this Court for the April 2018 term.  The appeal was submitted for decision on the briefs.  This is yet another case with an excessive delay between appellant's sentencing and the arrival of the appeal in this Court.  See *Owens v. State*, 303 Ga. 254, 258-259 (4) (811 SE2d 420) (2018).

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. Two days before she died, Sherry called Sheriff Ralph Kellett and told him that appellant was going to kill her. Sheriff Kellett did not take action after speaking on the phone with appellant, who assured him everything was fine. On the evening of January 21, 1996, law enforcement officers responded to a telephone call from appellant, in which he said that he had killed his wife. Upon arrival at the home, officers found Sherry deceased from two gunshot wounds, one to her neck and one to her left eye. Her body was sitting upright in a living room chair with her legs crossed. A bowl of food was in the crook of her right arm, and a bent fork was in her left hand. The officers found a shotgun on a nearby couch and a pistol on a table next to Sherry.

Appellant had a long history of inflicting violence upon Sherry, whom he had married in 1968, divorced in 1977, and remarried in 1978. Although Sherry was often secretive as to the source of her injuries, she confided in two close friends and her two sisters that appellant caused these injuries. She was admitted to the hospital several times in the 1980s for various injuries caused by appellant. On another occasion, she was injured so badly that her facial features

were barely discernible and her closest friends did not recognize her. Appellant shot Sherry in the head in the late 1980s, and another time he held a gun to her mouth and temple for hours, periodically firing it over her head. In 1991, appellant held Sherry down and cut her face five or six times with a razor blade, leaving permanent scars.

Appellant testified at trial that, on the day of the incident, Sherry had been drinking heavily and taking Xanax pills. Sherry was cold that day and asked appellant several times to adjust the thermostat. The thermostat was located on a wall next to a gun cabinet, and as appellant was adjusting it late in the afternoon, he heard a noise and turned to see Sherry pointing a pistol at him. In fear for his life, he quickly grabbed a loaded shotgun from the nearby gun cabinet, ran a few steps toward Sherry, and fired two shots at her in self-defense from a distance of ten to fourteen feet away. Other evidence shows, however, that Sherry was eating, not holding a pistol, when she was shot. An autopsy revealed that her stomach contained food of the same kind as what was in the bowl, and the bowl was soiled with what appeared to be blood. DNA from the blood on the fork matched Sherry's DNA, and traces of lead found on the fork were consistent with it being struck by lead pellets. Several officers at the crime

3

scene testified that the pistol on the table was covered with dust and looked as though it had not been touched recently. No blood or fingerprints were found on the pistol.

Other evidence is also inconsistent with appellant's initial statement to the police that he fired the shotgun from ten to fourteen feet away and from the direction of the gun cabinet. Ballistics reports and crime scene evidence indicate that the shotgun blasts must have originated from within three feet of Sherry. Due to the angle of the gunshots, some shotgun pellets should have hit a lamp on the table next to the victim if the shotgun was fired from the area of the gun cabinet, but the lamp was without a scratch.

Appellant does not challenge the legal sufficiency of the evidence supporting his conviction. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that the evidence presented at trial was sufficient to authorize a rational jury to find appellant guilty beyond a reasonable doubt of felony murder. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Appellant contends that the trial court erred by admitting statements made by Sherry to two of her friends and to her two sisters describing prior acts

4

of violence by appellant toward her. According to appellant, these statements were hearsay, and the trial court abused its discretion in admitting them under the necessity exception to the hearsay rule. We disagree.

Altea Kellett testified that she and Sherry became friends in first grade and that they remained close friends throughout Sherry's life. She added that Sherry would confide in her that appellant abused her, and Kellett described several of those instances, including one in which she visited Sherry in the hospital after Sherry had been shot in the head. According to Kellett, Sherry said that appellant had been the one that shot her on that occasion. On another occasion, Sherry told Kellett that appellant had cut her across the face with a straight razor five or six times. Kellett said that Sherry had scars from that attack for the rest of her life. According to Kellett, Sherry confided in her that, when Sherry was afraid of appellant, she would sometimes drive to the Kelletts' home and spend the night in her car in their driveway.

Another witness, Joan Lonergan, had, at one point, considered Sherry her best friend. They had known each other since the early 1960s, when they were in high school together. Lonergan was also Sherry's hairdresser. Lonergan testified that Sherry regularly confided in her about the abuse at the hands of

5

appellant and that Lonergan and Sherry had the type of relationship where Sherry felt like she could trust Lonergan. Among other instances of violence, Lonergan said that Sherry came into the salon one day and had been beaten so severely around the face that she was unrecognizable. Sherry told Lonergan that appellant had inflicted her injuries. In addition, Lonergan testified that she personally witnessed appellant beat Sherry severely after he became mad at her. On yet another occasion, Sherry came to Lonergan's home after she had been battered by appellant and asked for Lonergan's help. That day, Lonergan got Sherry to agree to go to a shelter, but Sherry changed her mind while they were driving there, saying that she was scared what appellant would do when he found out. Sherry also told Lonergan about the incident during which appellant pointed a handgun at the victim for hours, sometimes putting it in her mouth and sometimes firing it over her head.

Both of Sherry's sisters also testified about statements made to them by the victim. Nell Vaughn testified that, over the years, she had noticed that her sister was being physically abused and that the injuries consisted of "[b]lack eyes, busted lips, just blue places all over her face." According to Vaughn, Sherry wore sunglasses to cover her injuries. They did not discuss the abuse

often because Sherry was ashamed of "living in it," but Sherry told Vaughn that appellant caused her injuries. Once in the late 1980s, Vaughn went to the Bishops' home and found her sister with a "big knot" on one cheek, a busted lip, a swollen eye, and a bloody nose. Vaughn was going to take her to the hospital, but Sherry said that her back was hurt as well and that she could not get up. Appellant then appeared and said that Vaughn was not taking Sherry anywhere. He began pushing and hurting Vaughn; she escaped from him and ran toward the door, but he caught her and threw her down the front stairs. At one point, Sherry lived with Vaughn for about a month, and Vaughn begged her to leave appellant, but she would not. Vaughn also took Sherry, who lived in Summerville, to Rome for treatment for alcohol abuse once or twice a week for two months, staying in Rome for several hours while Sherry was being treated and then driving her back home. Vaughn added that she would visit with her sister three or four times a week, but generally not in Sherry's home because she did not feel welcome there.

The victim's other sister, June Mitchell, testified that, over the years of her sister's marriage to appellant, she would see Sherry with signs of physical abuse, including black eyes, and that, in the mid-1980s, Sherry suffered a

7

collapsed lung and told Mitchell that appellant caused the injury. She pleaded with Sherry to leave appellant and told her that she could come live with the Mitchells. Although Mitchell lived in Marietta, which was some distance from her sister, she saw Sherry "most every weekend" and would talk with her frequently on the phone. Sherry, who was a certified public accountant, traveled for work near the Atlanta area and would "spend the night with [her] a lot." Mitchell added that she and Vaughn knew their sister abused alcohol, and on one occasion, they convinced Sherry to enroll in an "in house" abuse program in Smyrna for six weeks; Mitchell went to see her every night.

Under our old Evidence Code, see former OCGA § 24-3-1 (b), which is applicable to this case, there are

> three basic requirements for the admission of hearsay under the necessity exception: (1) the declarant of the statement is "unavailable," (2) the declarant's statement "is relevant to a material fact and . . . more probative on that material fact than other evidence that may be procured and offered," and (3) the statement exhibits specific indicia of reliability.

*Mills v. State*, 287 Ga. 828, 831 (3) (700 SE2d 544) (2010) (citations and punctuation omitted). "In determining whether an out-of-court statement bears sufficient indicia of trustworthiness, we look at the totality of the

8

circumstances." *Gibson v. State*, 290 Ga. 6, 8 (3) (717 SE2d 447) (2011). "The trial court's determination as to the applicability of the necessity exception should be affirmed absent an abuse of discretion." *Rai v. State*, 297 Ga. 472, 477 (2) (775 SE2d 129) (2015).

Here, Sherry turned to her sisters and friends to confide in them about the domestic abuse that she suffered, as well as to seek help from them to deal with her substance abuse. It is true, as appellant notes, that Sherry had not seen Lonergan for about five years before her death, but that was because Lonergan had moved out of state. It is also true, as appellant notes, that Sherry abused alcohol and Xanax and that some of the times that Sherry confided in her friends and sisters were well before her death in 1996, but we conclude that, viewing the totality of the circumstances, the trial court did not abuse its discretion in concluding that, at the time the statements were made, they exhibited specific indicia of reliability. See *McNaughton v. State*, 290 Ga. 894, 899 (3) (b) (725 SE2d 590) (2012); *Allen v. State*, 284 Ga. 310, 314 (2) (667 SE2d 54) (2008); *Gibson*, 290 Ga. at 8 (3).

Appellant also argues that Sherry's statements were inadmissible because they were not more probative "'than other evidence that may be procured and

offered.'" *Mills*, 287 Ga. at 831 (3) (citation omitted). Appellant, however, provides no citation to any evidence in the record to support his claim and makes no argument about why Sherry's statements to her friends and sisters would not be more probative than any such evidence. Further, although Sherry's doctor testified about physical injuries resulting from "marital discord" that she suffered over the years, and Lonergan and Vaughn testified about two instances of violence by appellant against Sherry that they personally witnessed, we conclude that those instances are not more probative than the picture of years of abuse painted by Sherry's statements to her closest friends and family. See, e.g., *Campos v. State*, 273 Ga. 119, 121 (2) (538 SE2d 447) (2000) (witnesses' testimony that victim told them of prior abuse by defendant more probative than other evidence offered).

For these reasons, we find no merit to appellant's contention that the trial court abused its discretion in allowing Sherry's statements into evidence.

Judgment affirmed. All the Justices concur.

Decided October 22, 2018.

Murder. Chattooga Superior Court. Before Judge House.

Jennifer E. Hildebrand, for appellant.

Herbert E. Frankin, Jr., District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Assistant Attorney General, for appellee.