**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0062
Cleveland Clark
v.
The State

On Appeal  from the Superior Court of Fulton County
No. 48640

Decided: June 2, 2026

ELLINGTON, Justice.

Cleveland Clark appeals his convictions for malice murder and other crimes in connection with the April 2000 murder-for-hire of Michelle Reid Rai.[1] Clark asserts on appeal that his trial

---

[1] Michelle Rai was killed on April 26, 2000, and on September 22, 2006, a Fulton County grand jury indicted Clark, along with Chiman Rai, Carl V. Clark, Herbert Green, and Willie Fred Evans, on one count of malice murder (Count 1), two counts of felony murder (Counts 2 & 3), aggravated assault (Count 4), burglary (Count 5), possession of a knife during the commission of a felony (Count 6), and conspiracy to commit a crime (Count 7), and indicted Cleveland Clark alone for cruelty to children in the first degree (Count 8). Count 8 of the indictment was dead docketed prior to trial,  and Clark was tried separately on the remaining counts from May 28 to July 2, 2009. The jury found Clark guilty on Counts 1 through 7 on June 26, 2009,  and on July 2, 2009, in the sentencing phase of the trial, the jury recommended a sentence of death on Count 1, after finding the existence of five aggravating factors. The same day, the trial court sentenced Clark to death on Count 1 and further sentenced him to 20 years in prison on Count 5, to run consecutively to Count 1; five years in prison on Count 6, to run consecutively to Count 1; and ten years in prison on Count 7, to run consecutively to Count 5. Counts 2 and 3 were

counsel provided constitutionally ineffective assistance, which prejudiced his defense; that the trial court's refusal to grant a continuance all but guaranteed that Clark's attorneys could not render constitutionally effective assistance of counsel; and that the trial court violated Clark's right not to be tried while incompetent. Clark asserts that he is entitled to a new trial on these grounds, but if we determine that the record below is insufficiently developed on the issue of ineffective assistance of counsel, he asks that we remand this case with instructions that the trial court hold an evidentiary hearing on the issue. Because Clark was represented by counsel from the same public defender's office from the time of his arrest until the time he filed his notice of appeal, this appellate proceeding represents Clark's first opportunity to raise his claims of ineffective assistance of trial counsel, and we remand this case for an evidentiary hearing on that issue.

The evidence at Clark's trial showed the following.

---

vacated by operation of law, and Count 4 was merged into Count 1.

Clark filed a general motion for new trial on July 2, 2009, which was amended on October 1, 2014, and supplemented on September 2, 2015. After hearings on November 24, 2015, and December 18, 2015, the trial court partially granted the motion on March 28, 2016, ruling that Clark was entitled to a new trial on the sole issue of "mental retardation" relating to sentencing. And on December 13, 2021, the trial court issued a "final order" denying the remainder of the motion for new trial. Following a sentencing hearing on February 27, 2024, Clark was re-sentenced on Count 1 to life in prison without parole and Count 7 was merged into Count 1. The sentences on the other counts remained the same. Clark filed a notice of appeal on March 27, 2024, and amended that notice two days later on March 29, but this Court dismissed that appeal on March 31, 2025, because the dead-docketed Count 8 was not yet resolved. The State subsequently moved to nolle prosequi Count 8, and the trial court granted that motion on April 7, 2025. Clark then filed another notice of appeal on May 5, 2025, initiating the current appeal, and amended that notice on July 2, 2025. The appeal was docketed to the term of this Court beginning December 2025 and submitted for a decision on the briefs.

2

Michelle and Rajeeve Rai were married in March 2000 and shared a daughter, who was born in October 1999. On the afternoon of April 26, 2000, Rajeeve returned to the couple's apartment in Union City, Georgia, to find that Michelle had been strangled and stabbed to death, while their child was left alone. In June 2008, a jury convicted Ricky's father, Chiman Rai , of multiple criminal charges, including malice murder and criminal conspiracy to commit murder, in connection with Michelle's death, and this Court affirmed that conviction in 2015. See *Rai v. State*, 297 Ga. 472 (2015). The State's theory in that case was that Chiman, who was from India, did not approve of his son's marriage to Michelle, who was African American, so he hired someone to kill her. Id. at 473. The State argued at Clark's trial that Clark was the man paid to kill Michelle.

Herbert Green testified at Clark's trial that he worked with Chiman for a number of years in Jackson, Mississippi, and sometime in 2000, Chiman asked him to kill Michelle. When Green declined to do the killing, Chiman asked if Green knew someone who would do it. Green, in turn, asked his friend Willie Fred Evans if he knew anyone who would be willing to kill Michelle, and Evans said that he "could have [the murder] done." Evans testified that, after speaking with Green, he asked Clark if he would do the job for $10,000. Evans said Clark agreed and asked for $1,500 up front to cover the expense of travel between Mississippi, where Clark lived, and Georgia, where Michelle and Rajeeve lived. Chiman later brought $1,500 to Green in a brown paper bag, along with a note with Michelle's name and a Georgia address. Green gave the brown paper bag containing the $1,500 and the note to Evans, who gave them to Clark. Evans said that when Clark arrived in Georgia and later ran into difficulties in completing the job, Clark asked for more money. Evans relayed this request to Green , and Green later obtained $10,000 in cash from

3

Chiman, which Green gave to Evans. Evans then wired additional money to Clark in several installments.

Clark traveled to Georgia in April 2000, along with his brother Carl V. Clark, and they visited with their teenage cousin, Jammie Tatum. Over a period of a few days, Tatum took several rides with the Clarks. On one occasion she rode with Carl to pick up money that had been wired through Western Union, and, on another occasion, she rode with Clark to an apartment complex in Union City where he took photographs. A few days later, Tatum and her best friend, Clinique Jackson, rode back to the same apartment complex with Clark. When they arrived at the complex, Clark directed the girls to knock on an apartment door to determine who was inside, and they reported to Clark that a woman with a baby answered the door. Clark told them to go back and knock on the door again and ask to use the bathroom, but, this time, he went with them, while concealing himself. When the woman, whom they later learned was Michelle, opened the door to let the girls in, Clark came into the apartment with a gun and told Michelle to get down on the floor. Clark began choking Michelle with a vacuum cleaner cord until she stopped moving. Clark then directed both girls to leave the apartment. Tatum left first. As Jackson was leaving, she saw Michelle's body "jerking" and observed Clark begin stabbing Michelle with a knife.

Clark and the two girls left the apartment complex and returned to Tatum's house, where Clark made a telephone call and the girls listened to the call on an extension. They heard Clark tell a man on the phone that "it was done," or that "he had [taken] care of that," and the other man directed Clark to "come on back home." Evans testified that after Michelle was murdered, Clark called him to say that he got the job done, and the next day, when Clark was back in Mississippi, Evans paid him the remainder of

the $10,000, less Evans's cut of $1,500.

The investigation into Michelle's murder stalled until 2004 when Jackson was arrested following a high-speed chase and charged with multiple crimes. Jackson told police about Clark's involvement in Michelle's murder in the hope of more lenient treatment in connection with those crimes. And on September 22, 2006, Clark was indicted along with his brother Carl, Chiman, Green, and Evans, in connection with Michelle's death.

Following his indictment, Clark was represented by the Capitol Defender's Office (the "CDO") in Fulton County, which relied on the Georgia Public Defender Standards Council ("GPDSC") to fund the cost of the CDO's investigation and expert witnesses for the defense. Clark's trial was scheduled for May 28, 2009, at a time when GPDSC was experiencing serious financial problems. And in January 2009, Clark's defense began raising issues about its inability to prepare for trial due to a lack of funding. The State first noted at a January 9 status conference that budgetary issues had led the governor to prohibit out-of-state travel by state employees, hampering the CDO from collecting mitigation evidence in Mississippi, where Clark grew up and lived at the time of the murder. The financial challenges for the defense in preparing its case were further discussed at a March 16, 2009 motion hearing/planning conference.

Then, on March 23, 2009, the trial court held the first in a series of ex parte conferences on the issue.[2] Defense counsel reported at that conference that GPDSC employees told him that

---

[2] The transcripts of the ex parte conferences originally were filed under seal and remained sealed when the record was transmitted to this Court. But because Clark's defense occasionally relied on portions of those sealed records

5

funding for experts likely would be unavailable for Clark's trial because GPDSC had over $400,000 in unpaid expert fees. In subsequent ex parte conferences, the defense continued to report on the challenges it was facing due to a lack of funding, noting that at least two experts it intended to call were already owed money by GPDSC for prior work performed, that those experts were telling the defense that they could not get their analyses done before the scheduled May 28 trial, and in other capital cases, the CDO was being told that it would be July 1 before it could expect to even ask for money for experts.

In an ex parte session on May 4, 2009, the defense reported that, although some experts were being paid, those with pay concerns were asking Fulton County to guarantee payment. Additionally, because the trial was scheduled for May 28, many of the potential experts were telling the CDO that they did not have enough time to perform testing on Clark and prepare a report. Defense counsel said that he did not believe that the defense would be able to get a mitigation case ready before trial. The trial judge replied that "the experts just need to get on it and do whatever they need to do" because he could not keep postponing the trial. Three days later, on May 7, 2009, in another ex parte conference, the defense reported that it had narrowed down their request to three experts, but that no contracts had been signed because none of the experts would sign a contract without a payment guarantee from someone other than GPDSC.[3]

in its court filings and because it appears that the need for confidentiality has passed, we issued an order unsealing the records to allow full consideration of the issues raised by the parties. See order dated May 19, 2026.

[3] On May 8, 2009, the director of the CDO emailed GPSDC to identify potential expert witnesses needed for Clark's trial and the estimated costs of retaining them, which came to between $38,000 and $58,000.

Then, at an ex parte conference on May 20, the defense reported that GPDSC agreed to give them $10,000 and nothing more before July 1, 2009. The defense further reported that it entered into a $5,000 contract with one expert, leaving the defense without sufficient funds to hire the other experts it needed.[4] Accordingly, defense counsel said that he planned to announce at the start of trial that he was not ready to try the case. But the trial judge announced his intention to proceed with the trial as scheduled.[5]

The defense filed a motion for a continuance two days later, on May 22, 2009, along with a "Notice of Intent of Defense to Raise Issue of Mental Retardation and Mental Incompetence."[6] The notice apparently was based on a verbal report received the same day from the defense's expert preliminarily opining that Clark met the diagnostic criteria for mental retardation and appeared

---

[4] GPDSC apparently approved the $10,000 for Clark's trial on or around May 18, 2009, ten days before trial. The CDO then entered into a contract with that expert, which was dated as of May 19, 2009.

[5] The trial judge told defense counsel, "I am not going to delay this case. And you are not going to delay it, if you value your professional reputation and your license to practice law…. All you can do is the best you can do. You and I both will let the Supreme Court sort this out."

[6] This opinion uses the terms "mental retardation" and "mentally retarded" because that was the statutory language at the time of Clark's trial. See OCGA § 17-7-131(c)(3), (j) (providing for a life sentence for any defendant who is convicted but can prove his or her intellectual disability beyond a reasonable doubt in the guilt/innocence phase of his or her death penalty trial); OCGA § 17-7-131(a)(2) (as amended in 2017 to replace the term "mentally retarded" with the term "intellectual disability" and to renumber paragraphs but otherwise without making any change to the relevant definition: "'Intellectual disability' means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period.").

not to be competent to stand trial. The trial court held an evidentiary hearing on the motion for continuance on May 27, 2009, the day before the trial was scheduled to begin, at which witnesses from the CDO and GPDSC addressed the GPDSC funding crisis. The evidence showed that the CDO had received a verbal confirmation for an amount not to exceed $10,000 for the current fiscal year and that the GPDSC budget was "down to pretty much nothing for the capital defender." GPDSC had $165,000 available for the CDO but owed $370,000 in outstanding bills. The GPDSC nevertheless approved $10,000, with a $5,000 backup, for Clark's trial using money set aside by the GPDSC director "to keep cases moving." After noting that the executive branch's budgetary issues were negatively affecting the judiciary, the trial court ruled at the hearing that it was denying Clark's motion for continuance and ordered GPSDC to deposit $60,000 into the registry of the trial court.[7]

Voir dire in Clark's criminal trial commenced the next day, on May 28, 2009. During the first two days of voir dire, in response to the defense's notice of intent to raise issues of mental retardation and incompetency, the trial court issued orders allowing the State to hire two experts to conduct mental evaluations of Clark for the State, paid for at public expense, on his competency to stand trial, the presence or absence of mental illness, and his intelligence quotient.

After receiving confirmation that the defense expert's final report found Clark to be incompetent, Clark's counsel filed a "Special Plea of Incompetency to Stand Trial and Demand to Impanel

---

[7] On June 2, 2009, the trial court signed an order vacating that May 27 order and entered a new order requiring the same deposit of funds into the registry within five days of GPDSC's receipt of its next fiscal allotment from the State of Georgia.

a Special Jury to Try the Issue" in open court on June 2, 2009. The trial court then paused the criminal trial proceedings to hold a civil trial on the issue of Clark's competency to stand trial that began the same day, June 2, and lasted through June 4, 2009. Defense counsel opposed proceeding to the civil trial at that time, noting that although he felt professionally obligated to file a plea of incompetency once the defense expert raised the issue, he believed that further testing was required to more accurately determine whether Clark was competent to stand trial. Defense counsel then asserted, "[U]nder the circumstances, I will put on the record that I am not ready to strike this jury." The trial court replied that he intended to strike the civil jury and then proceeded with voir dire of a separate jury panel for the civil trial.

The defense expert testified at the civil trial that Clark tested as mildly mentally retarded, and in the doctor's opinion, was incompetent to stand trial. One of the State's experts testified that, in his opinion, Clark was competent to stand trial as of three days earlier and was malingering the symptoms of mental retardation, memory loss, and competency. A report prepared by the second State expert, which was entered into evidence, also opined that Clark was "malingering mental retardation."[8] The civil jury found against Clark's plea of incompetency, determining that Clark was competent to stand trial.

The criminal trial resumed on June 5, 2009, with voir dire continuing on June 6 and witness testimony beginning on June 18, 2009. The criminal jury ultimately convicted Clark on all the counts it considered. Following further testimony and argument in the sentencing phase of trial, the jury determined that Clark

---

[8] The State also presented the testimony of two non-expert witnesses who had interacted with Clark while he was in custody and called Clark himself to testify.

9

should receive the death penalty on Count 1, malice murder. And on July 2, 2009, the trial court sentenced Clark to death on Count 1 and imposed various terms of imprisonment on Counts 5 to 7, while the other charges were either vacated by operation of law or merged. (See footnote 1.)

Following his convictions and sentencing, Clark's assigned CDO trial attorneys filed a general motion for new trial on July 2, 2009,  which was amended by new post-trial counsel from the CDO on October 1, 2014, and supplemented on September 2, 2015. Following two hearings, the trial court entered an order partially granting the amended motion for new trial on March 28, 2016. That order granted Clark a new trial "solely on the issue of mental retardation" in connection with sentencing. In that order, the trial court acknowledged that Clark was only able to raise issues of mental retardation and mental competency less than one week before trial and that "[t]he fact that this information was not available earlier in the process was attributable to a catastrophic funding breakdown in the state indigent defense system." However, the trial court noted the defense did not raise the issue of mental retardation or seek a verdict option of guilty but mentally retarded in the guilt/innocence phase of trial because Clark insisted that he was not guilty, and the State successfully argued that the defense could not enter a plea of not guilty in that phase of trial and also assert mental retardation for purposes of sentencing.

The trial court determined that the defense nevertheless was able to present some evidence of mental retardation during the sentencing phase, and the court found that "[a]lthough vigorously contested by the State, in retrospect, this evidence was nonetheless sufficient to give rise to a reasonable probability that … Clark could have been found by a jury to be to a person with

10

mental retardation beyond a reasonable doubt." But "[b]ecause of the State's objections and the Court's concurrence, the jury in this case was never called upon to make a factual determination as to whether … Clark met the relevant criteria for mental retardation beyond a reasonable doubt" as required by law. Therefore, the trial court partially granted the motion for a new trial, finding that "Clark is entitled by both state and federal law to have his claim of mental retardation decided prior to being subjected to the death penalty … because defense counsel never waived this claim."

After the judge from Clark's trial retired in or around December 2016 , a new judge was assigned to the case. The new judge held a status conference, on November 27, 2018, and a non-evidentiary hearing on December 14, 2018, to address the issues remaining for decision in connection with the motion for new trial. The trial court subsequently issued a "Final Order Resolving Defendant's Motion for New Trial" on December 17, 2021. And on February 27, 2024, the trial court held a re-sentencing hearing in accordance with the March 28, 2016, order partially granting the motion for new trial. At the hearing, the State asked the trial court to sentence Clark "short of the death penalty for finality in this case." Therefore, the only issue left for the court to decide was whether the sentence for Count 1, murder, should be life without the possibility of parole or life with the possibility of parole.[9] During the hearing, Michelle's father read a victim impact statement via Zoom, and the defense relied on a prepared packet, filed five days earlier, containing expert affidavits and other ma-

---

[9] The State also conceded a defense argument that Clark should not have been sentenced on Count 7, conspiracy to commit a crime, but instead that count should have merged into Count 1.

terials, addressing the issues of Clark's possible mental retardation and sentencing . After hearing arguments from the parties, the trial court pronounced its revised sentence at the hearing, sentencing Clark to life without the possibility of parole on Count 1 and merging Count 7 into Count 1, which removed the prior ten-year prison sentence on that charge. All the other sentences remained the same.

Clark retained private counsel to represent him on appeal, and she entered a notice of appearance of March 8, 2024, concluding the CDO's representation of Clark.

1. Clark first asserts that his counsel provided constitutionally ineffective assistance at trial, which prejudiced his defense. Clark contends that he was denied the effective assistance of counsel "on multiple fronts," asserting that his attorneys were deprived of the tools they needed to present "a constitutionally appropriate defense" and also failed to meet the required professional standard of care on basic tasks within their control. Specifically, Clark asserts that his trial attorneys were ineffective for not having him timely evaluated for competency to stand trial, in failing to impeach key witnesses for the State, and in failing to conduct a meaningful pretrial investigation.

(a) The State asserts, however, that "it is possible" that Clark did not preserve his claims of ineffectiveness of counsel for appellate review because he did not assert them at the earliest practicable opportunity. See *Henderson v. State*, 322 Ga. 304, 313 (2025) (determining that ineffectiveness of counsel claim "must be raised at the earliest practicable moment, … before appeal if the opportunity to do so is available," and such opportunity becomes available "when the convicted defendant is no longer represented by the attorney who represented him at trial" (quotation marks omitted)).

It is undisputed that Clark was represented by the CDO, albeit by a succession of different attorneys within that office, from the time of his arrest to the time of his direct appeal. And in *Ryan v. Thomas*, 261 Ga. 661, 662 (1991), this Court determined that "different attorneys from the same public defender's office are not to be considered 'new' counsel for the purpose of raising ineffective assistance claims," and thus, "a defendant's right to raise such a claim may not be barred by the failure of a succession of attorneys from the same public defender's office to raise it."

However, in arguing that Clark's claims of ineffectiveness of counsel "possibl[y]" could be barred, the State relies on *Chatman v. Mancill*, 280 Ga. 253, 255 (2006), in which this Court concluded that the trial court erred in excusing the defendant's failure to timely raise an ineffectiveness of counsel claim on the ground that all of the defendant's counsel had been employed by the same public defender's office. This Court determined that the trial court "overlooked the crucial fact," as shown in the record, that the counsel who were the subject of the ineffectiveness claim had left the public defender's office by the time a later assigned public defender had the opportunity to raise it. Id. Accordingly, we determined that "[t]he rationale in *Ryan* was not applicable to [the appellant's] post-trial counsel who were no longer members of the [public defender's office]." Id.

Nevertheless, the State acknowledges that we also have determined that a direct appeal represented a defendant's first opportunity to raise claims of ineffective assistance by a public defender where the defendant's appellate attorney was appointed after the motion for new trial was decided and the notice of appeal was filed, and where nothing in the record indicated that the trial attorney was no longer employed by the public defender's office. See *Hung v. State*, 282 Ga. 684, 685 (2007).

Here, because the State has not pointed to any evidence in the record demonstrating whether, or when, Clark's trial counsel left the employ of the CDO, we have no basis on which to conclude that Clark's claims of ineffectiveness of counsel were waived, and "[t]hus, it must be concluded that this issue is being raised at the first practicable moment." Id. at 685 (quotation marks omitted).

(b) To establish his claims of ineffective assistance of counsel, Clark must prove both that his counsel's performance was deficient and that the deficient performance prejudiced him. See *Strickland v. Washington*, 466 US 668, 687 (1984). "To prove deficient performance, [an appellant] must show that his counsel performed in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Ward v. State*, 313 Ga. 265, 272–73 (2022) (quotation marks omitted). See also *Strickland*, 466 US at 688. "To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Lanier v. State*, 310 Ga. 520, 524 (2020) (citing *Strickland*, 466 US at 694).

The State asserts that Clark's claims fail because he did not meet his burden under the prejudice prong to show that an earlier investigation into his competency, impeachment of the State's witnesses, or a more thorough investigation would have uncovered any additional evidence or further expert opinion sufficient to create a reasonable probability that the outcome of his trial would have been different. But because Clark is represented by non-CDO counsel for the first time in this appeal, thus making the appeal Clark's first opportunity to raise these claims, he has not yet had an opportunity to present evidence on what an earlier mental evaluation, impeachment of the State's witnesses, or fur-

14

ther pretrial investigation may have shown. Thus, the issues cannot be determined from the record before us. Accordingly, we vacate the trial court's judgment, in part, and remand for an evidentiary hearing on Clark's claims of ineffective assistance of counsel. See *Green v. State*, 295 Ga. 108, 112 (2014); *Williams v. State*, 280 Ga. 297, 298 (2006); *Shadron v. State,* 275 Ga. 767, 769 (2002).

2. Clark also asserts that the trial court's refusal to grant a continuance "all but guaranteed that … Clark's attorneys could not render constitutionally effective assistance of counsel."

It is well established that "[w]hether to grant a motion for continuance is entirely within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion." *Yarn v. State*, 305 Ga. 421, 425 (2019) (quotation marks omitted). See also OCGA § 17-8-22. And "[t]o obtain a new trial based upon the denial of a motion for a continuance, an appellant must show not only a clear abuse of discretion on the part of the trial court in denying the motion but also that he was harmed by that denial." *Blalock v. State*, 316 Ga. 330, 338 (2023).

Although Clark acknowledges that trial courts generally are afforded wide latitude to grant or deny requests for a continuance, he asserts that, in light of the extreme financial difficulties of the GPDSC, the trial court knew that the defense lacked adequate funding for a mitigation investigation or for expert witnesses, and that the denial of a continuance under those circumstances amounted to a clear abuse of discretion.[10] But even if the

---

[10] We note that Clark presented significant argument regarding the denial of his request for a continuance in his motion for new trial, but the trial court did not address that denial in either of its orders denying a new trial.

15

trial court abused its discretion, Clark was required to show how he was harmed by that decision, and he has not pointed to any evidence showing that a grant of his motion to continue the trial would have enabled other experts and further investigation to turn up additional support for his claim of incompetency or further mitigation evidence.

Because Clark failed to carry his burden to show how the failure to grant his motion for continuance resulted in harm, he has not shown that he is entitled to a new trial on this ground. See *Blalock*, 316 Ga. at 339 (holding that there was no ground for new trial based on denial of continuance where, among other reasons, defendant did not show further expert testimony would have helped him formulate an effective defense or how the testimony would otherwise have benefitted him at trial); *Anglin v. State*, 312 Ga. 503, 510 (2021) (concluding that defendant was not entitled to a new trial where he failed to show how the lack of additional time for further investigation harmed him); *Phoenix v. State*, 304 Ga. 785, 789 (2018) (explaining that, to show harm from the denial of a continuance, a defendant must identify what other evidence or witnesses he would have put forth if given more time, and "speculation and conjecture are not enough" (citation omitted)).

3. Clark further asserts that the trial court violated his right not to be tried while incompetent. He contends that he was denied a fair trial because the trial court did not follow the proper procedures to determine whether he was competent to stand trial.

The State argues, however, that Clark has failed to show

However, the second and final order addressing the motion for new trial provides that the trial court was denying all unresolved issues attacking Clark's convictions, and thus it appears that the trial court summarily denied Clark's claims that he was entitled to a new trial based on the denial of a continuance.

that he preserved this claim for appellate review. Clark did not assert the claim he now raises on appeal in the trial court below, either at trial or in his amended motion for new trial, and the trial court issued no ruling on such a claim. See *Clay v. State*, 309 Ga. 593, 593–94 (2020) (concluding that defendant waived claims by not raising them in the trial court and obtaining a ruling on the issue below). But even if Clark properly had preserved this claim for appeal, his argument on this ground fails because he did not show how any alleged procedural error by the trial court resulted in harm to him or that following the procedures Clark now argues should have applied would have produced a different result at the trial on his competency. Accordingly, Clark's argument on this ground fails.

*Judgment affirmed in part and vacated and remanded in part. All the Justices concur, except Peterson, C.J., and Warren, P.J., not participating and LaGrua, J., disqualified.*