317 Ga. 809
FINAL COPY

S23A0881. BATES v. THE STATE.
S23A1225. JORDAN v. THE STATE.
S24A0055. SOUTHERN v. THE STATE.

PINSON, Justice.

Tavius Bates, Octavious Jordan, and Jeremy Southern were convicted along with two co-defendants of crimes arising from the shooting death of Nicholas Hagood.[1]

---

[1] The crimes occurred on March 26, 2014. On July 18, 2014, a Fulton County grand jury indicted Bates, Jordan, Southern, and two co-defendants—Stephen Willis and Demetrius Fortson—on eight counts each: malice murder, armed robbery, felony murder predicated on armed robbery, hijacking a motor vehicle, felony murder predicated on hijacking a motor vehicle, aggravated assault, felony murder predicated on aggravated assault, and possessing a firearm during the commission of a felony. Willis alone was also indicted for possession of a firearm by a convicted felon and felony murder predicated on that charge. The defendants were tried together before a jury from August 28 to September 8, 2017. The jury found Southern guilty of all counts and found Bates, Jordan, Willis, and Fortson not guilty of malice murder but guilty of the remaining counts. We affirmed Willis's and Fortson's convictions on appeal. See *Willis v. State*, 315 Ga. 19 (880 SE2d 158) (2022); *Fortson v. State*, 313 Ga. 203 (869 SE2d 432) (2022).

Bates was sentenced to life in prison for felony murder predicated on armed robbery, 20 years in prison for hijacking a motor vehicle, and five years in prison suspended for possessing a firearm during the commission of a felony, all to run concurrently. The remaining counts merged or were vacated by operation of law. On September 25, 2017, Bates filed a timely motion for new trial, which he amended through new counsel. After a hearing, the trial court

In separate appeals, all three co-defendants argue that the evidence was not sufficient to sustain their convictions. In addition, Bates contends that the trial court should have granted a mistrial when a detective testified that Jordan told police he drove "the other subjects" to the crime scenes, which Bates says violated his Confrontation Clause rights under *Bruton v. United States*, 391 U.S. 123 (88 SCt 1620, 20 LE2d 476) (1968). And Southern contends that

denied the motion for new trial, as amended, on February 21, 2023. On March 21, 2023, Willis filed a timely notice of appeal. The case was docketed to the August 2023 term of this Court and submitted for a decision on the briefs.

Jordan was sentenced to life in prison for felony murder predicated on armed robbery, 20 years in prison for hijacking a motor vehicle, and five years in prison suspended for possessing a firearm during the commission of a felony, all to run concurrently. The remaining counts merged or were vacated by operation of law. On September 20, 2017, Jordan filed a timely motion for new trial, which he amended through new counsel. After a hearing, the trial court denied the motion for new trial, as amended, on February 21, 2023. On March 22, 2023, Jordan filed a timely notice of appeal. The case was docketed to the August 2023 term of this Court and submitted for a decision on the briefs.

Southern was sentenced to life in prison for malice murder, 20 years in prison for armed robbery, and 20 years in prison for hijacking a motor vehicle, all to run concurrently, and five years in prison for possessing a firearm during the commission of a felony, to be served consecutively. The remaining counts merged or were vacated by operation of law. On September 25, 2017, Southern filed a timely motion for new trial, which he amended through new counsel. After a hearing, the trial court denied the motion for new trial, as amended, on June 26, 2023. On July 10, 2023, Southern filed a timely notice of appeal. The case was docketed to the December 2023 term of this Court and submitted for a decision on the briefs. Southern's case has been consolidated on appeal with Bates's case and Jordan's case.

the trial court erred by instructing the jury about conspiracy because there was no evidence of a conspiracy, and by allowing a jailhouse informant to testify because the informant was acting as an agent of the State and he obtained incriminating information from Bates without counsel present.

Each of these claims fails. The evidence was sufficient as a matter of constitutional due process to sustain each of these defendants' convictions. Bates did not preserve his *Bruton* claim because he acquiesced to the trial court's curative instruction and failed to renew his motion for a mistrial after the instruction was given. It was not error for the trial court to instruct the jury about conspiracy because there was at least slight evidence of a conspiracy: the evidence showed that Southern and Bates confronted Hagood while the other co-defendants waited in the car, that the co-defendants left the crime scene together after the murder with Hagood's stolen car and cell phone, and that the co-defendants were either together or in contact with each other before, during, and after the murder. And the jailhouse informant was not an agent of

the State because there was no evidence of an agreement between the informant and the State.

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following.

On March 26, 2014, just after 12:30 p.m., Rayshon Smith was robbed at gunpoint. Smith was outside his cousins' apartment building in Austell (in Cobb County) when he noticed a car driving past slowly. The car was a silver or gray Ford Taurus with tinted windows, and Smith could see four men inside. Smith then noticed two men walking toward him. One of them came right up to Smith, pointed a gun at him, and went through his pockets while looking him in the eye. The man took Smith's wallet, phone, and keys. The other man also had a gun but did not come as close.

After the men left, Smith went into the apartment building and called the police. He gave police the number of his phone that was stolen. Later, Smith identified Southern in a photo array as the man who had been closest to him during the robbery.

About a half hour later, at around 1:00 p.m., Joseph James was

4

at home in his apartment in Fulton County, not far from where Smith was robbed. James was looking out the window into the parking lot and noticed two cars pulling up. One of the cars, which was driven by Hagood, pulled into a parking space. The other car wedged behind it. When Hagood got out of the car, he seemed "out of place" and "slightly disoriented." James saw Hagood and a man with dreadlocks standing next to the car that Hagood had been driving, while a third man remained in that car. Four or five men were in the other car. As James watched, Hagood appeared to check his pockets, and then appeared to say "I don't have anything" to the man with dreadlocks. The man with dreadlocks appeared to "check" Hagood, "like trying to figure out does he have something." At that point, one of the men from the second car got out, holding a gun, and moved toward Hagood and the man with dreadlocks. Hagood tried to run. James heard a gunshot. The medical examiner testified at trial that Hagood was killed by a gunshot wound to the back.

James called 911 at 1:16 p.m. Later, when shown photo arrays, James identified Southern as the man with the gun and Bates as

5

the man with dreadlocks who had been speaking to Hagood.[2]

Detective Scott Demeester, the lead investigator on the case, arrived at the scene at around 1:45 p.m. Demeester contacted Hagood's wife, who told him that Hagood normally would have a cell phone and a car, neither of which was found at the crime scene. Hagood's wife gave the detective Hagood's cell phone number and the tag number for his white Toyota Corolla, and Demeester put out alerts for both the phone and the car.

At the murder scene, police found a wallet and set of keys belonging to Smith, who had recently been robbed nearby. Detective Demeester contacted Smith and learned that his cell phone had been stolen in the robbery. The detective then subpoenaed the phone records associated with Smith's stolen phone, as well as those associated with Hagood's missing phone.

The records from Hagood's phone showed that someone sent a text message to Hagood's phone after the shooting, at 1:29 p.m. But

---

[2] At trial, James said he was "troubled" when he identified Bates in the photo array, because the photo of Bates in the array did not show him with a dreadlocks hairstyle. See *Fortson*, 313 Ga. at 210 (1).

that message was not received until 3:10 p.m., indicating that the phone was powered off or otherwise disconnected in the interim. When Hagood's phone finally received the message, it "pinged" off a cell tower in the area of an apartment complex on Kelly Lake Road in Decatur. Jordan's aunt lived in that complex. Jordan himself was living at a nearby hotel, and Southern lived in the area, too. A maintenance man from the Kelly Lake Road apartment complex testified that he had seen Hagood's white Toyota Corolla and the defendants' silver Ford Taurus parked at that apartment complex later in the week, after the shooting. Hagood's car was eventually recovered in the same area.

The records from Rayshon Smith's cell phone showed that someone used it several hours after it was stolen to call MetroPCS customer service to unlock it. After it was unlocked, the phone was used to place and receive calls and text messages to and from people that phone had never been used to contact before it was stolen. The new contacts included Southern, his co-defendant Stephen Willis, Jordan's girlfriend, and a phone number belonging to the mother of

7

the other co-defendant, Demetrius Fortson, who often used his mother's phone. Police searched the phone of another of the new contacts in Smith's phone, Dionte Wooten, and found that Smith's number was saved in Wooten's phone under Jordan's nickname, "Tay Tay."

Jordan and Bates were arrested and interviewed. In Jordan's interview, he admitted he was present at the armed robbery of Smith, that he took Smith's phone (and later sold it), and that he then drove to another location where a "white man" was robbed. Bates, in his statement, admitted he was present at both the robbery of Smith and the shooting of Hagood. Bates claimed that he was texting while the crimes were committed, but his phone records showed no text messages sent or received at that time. Portions of their statements were played for the jury at trial. Neither Jordan nor Bates mentioned any of their co-defendants in the portions of their statements that were played at trial.

In the portion of Jordan's interview that the jury did not hear, Jordan identified his co-defendants by name. Using that

information, Detective Demeester obtained a search warrant for the cell-phone records of Jordan, Bates, Southern, and Willis, as well as Fortson's mother. From those records, detectives put together a timeline of the defendants' whereabouts and phone activities on the day of the crimes, as follows.

On the morning of the crimes, Jordan, Bates, Southern, and their co-defendants were in regular contact. Jordan and Southern started out in the area of Decatur where they both lived, and their co-defendant Willis started out somewhere west of Stone Mountain. Jordan's and Southern's phones called each other at 8:53 a.m. and 9:20 a.m., and Jordan's and Bates's phones called each other at 10:19 a.m., 10:24 a.m., and 10:32 a.m. Bates's phone then went inactive for three hours, but Jordan and Southern continued using their phones. Shortly after 10:30 a.m., Jordan's and Southern's phones drove north on I-285 toward Stone Mountain Highway, then east on the highway toward Stone Mountain. Jordan's and Southern's phones called Willis's phone at 10:48 a.m. and 10:59 a.m., respectively; all three phones pinged off the same cell tower near

9

Stone Mountain. A little later, Southern's phone drove west on Stone Mountain Highway and south on I-285, heading back the way it and Jordan's phone had come. (Jordan's phone was inactive during this time.) At 12:05 p.m., Southern's phone called Fortson's mother's phone while Southern was approaching Fortson's home in southeast Atlanta.

A short time later, just after Smith was robbed, Jordan's phone received a call at 12:37 p.m., and Willis's phone made and received calls at 12:43 p.m. and 12:47 p.m., all in the area of the robbery. Southern's phone pinged off a cell tower in the same area at the same time. Likewise, minutes before Hagood was killed, Jordan's, Southern's, and Willis's phones all made calls near the murder scene.

The phones went silent for a time after the murder. Then, at 1:47 p.m., Bates's and Willis's phones both made calls near Fortson's home. Jordan's and Southern's phones made and received calls a short time later in the same area. All five defendants' phones pinged off cell towers in that area that afternoon—as did Hagood's stolen

phone, at 3:10 p.m.

The State also introduced testimony from a jailhouse informant. The informant, Victor Seldon, was in jail with Bates, who had been arrested on an unrelated charge after Hagood was killed. While they were in jail together, Bates told Seldon about the armed robbery of Rayshon Smith. Seldon asked his family to look into the matter and was eventually put in touch with the Cobb County district attorney's office. The district attorney's office arranged for Seldon to testify at the armed robbery trial. On the day Seldon was to testify, while waiting in a holding cell in the courthouse basement, he saw Bates and Southern walk by. Bates said to Southern, "[t]hat's that motherf**ker right there." Southern then said to Seldon, "Hey, man, keep your motherf**king mouth closed. We know your family. We know where they live. We even know what car they drive. Keep your motherf**king mouth closed." Southern named the specific model of car that Seldon's wife had recently purchased, which convinced Seldon that "they had to be pretty close upon it." Frightened by that threat, Seldon did not testify at the armed

robbery trial. Later, Seldon saw Bates again in the jail. Bates, who knew that Seldon would be released soon, offered to pay Seldon to "get rid of" a gun for Bates after Seldon was released.

2. All three appellants contend that the evidence was constitutionally insufficient to sustain their convictions. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). Bates and Jordan, relying on OCGA § 24-14-6, additionally argue that the evidence against them—which they characterize as purely circumstantial—did not exclude all reasonable hypotheses other than their guilt.

"We evaluate a due process challenge to the sufficiency of the evidence by viewing the evidence presented at trial in the light most favorable to the verdicts, and asking whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Henderson v. State*, 317 Ga. 66, 72 (2) (891 SE2d 884) (2023). We do not reweigh evidence, see *Williams v. State*, 304 Ga. 658, 660 (1) (821 SE2d 351) (2018), and we leave to the jury "the resolution of conflicts or

inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Perkins v. State*, 313 Ga. 885, 891 (2) (a) (873 SE2d 185) (2022) (citation and punctuation omitted).

A conviction may rest on circumstantial evidence alone if that evidence "exclude[s] every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. See *Davenport v. State*, 309 Ga. 385, 388 (1) (846 SE2d 83) (2020). Not every hypothesis is a "reasonable" one, and the evidence "need not exclude every *conceivable* inference or hypothesis," only the reasonable ones. *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019) (citation and punctuation omitted; emphasis in original). "The questions whether any alternative hypotheses are reasonable and whether the circumstantial evidence excludes any such hypotheses are for the jury." *Willis v. State*, 315 Ga. 19, 24 (2) (880 SE2d 158) (2022). See also *Merritt v. State*, 285 Ga. 778, 779 (1) (683 SE2d 855) (2009). Finally, we will not disturb the jury's findings on those questions unless they are "insupportable as a matter of law." *Graves*, 306 Ga.

at 487 (1) (citation and punctuation omitted).

Here, the evidence was sufficient to authorize the jury to find Bates, Jordan, and Southern guilty of Hagood's murder and the related crimes. Southern was directly identified as the shooter by a witness to the murder; the same witness identified Bates as the second man who confronted Hagood. See *Jackson v. State*, 307 Ga. 770, 772 (838 SE2d 246) (2020) (eyewitness testimony is direct evidence of guilt).[3] Jordan admitted that he drove the co-defendants to the scene of the murder, and Bates admitted he was present, too. See *Thrift v. State*, 310 Ga. 499, 502 (1) (852 SE2d 560) (2020)

---

[3] Bates acknowledges that James identified him as the second man who confronted Hagood. But he contends that we "determined" that the second man was his co-defendant Fortson when we affirmed Fortson's convictions.

We did not. At trial, James was unsure whether the man with dreadlocks he had seen going through Hagood's pockets was Bates or Fortson. We concluded the evidence authorized *the jury* to find that it was Fortson. See *Fortson*, 313 Ga. at 210-212 (1). This Court did not determine that it was Fortson—nor could we, as a court of review. See id. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. II ("The Supreme Court shall be a court of review…."); *Ellington v. State*, 314 Ga. 335, 341 (2) (877 SE2d 221) (2022) ("the resolution of . . . conflicts or inconsistencies in the evidence is for the jury, and we will not reweigh that evidence on appeal"). And in any event, James's identification of Bates was direct evidence of his guilt even though James expressed doubts. "[D]irect evidence is not converted into circumstantial evidence by a witness's credibility or lack thereof." *Harper v. State*, 298 Ga. 158, 161 (780 SE2d 308) (2015).

14

(confessions are direct evidence of guilt). Also, Smith's stolen wallet and keys were found at the murder scene, suggesting that the men who shot Hagood were the same men who had earlier robbed Smith—and "from that inference flowed further evidence implicating the group." *Willis*, 315 Ga. at 24 (2). Indeed, Smith identified Southern as one of the robbers, and after the murder, Jordan used Smith's stolen phone and later sold it. See *Eckman v. State*, 274 Ga. 63, 65 (1) (548 SE2d 310) (2001) (circumstantial evidence of guilt included defendant's use of "the fruits of the multi-county crime spree"). And later, Southern and Bates threatened Victor Seldon not to testify at their trial for the armed robbery. That evidence was sufficient as a matter of constitutional due process to support the co-defendants' convictions.

Bates and Jordan also raise a statutory sufficiency argument under OCGA § 24-14-6. They contend that the evidence of their guilt—which, again, they characterize as entirely circumstantial—did not eliminate the hypothesis that they were merely present at the crime scenes.

To begin with, the circumstantial evidence statute does not apply to Bates because there was direct evidence of his guilt: a witness identified him with Southern and Hagood at the scene of the shooting. See *Garay v. State*, 314 Ga. 16, 20 (2) (875 SE2d 631) (2022) ("if there is any direct evidence presented by the State, the circumstantial evidence statute does not apply to a sufficiency analysis"). So we apply the statute only to review the sufficiency of the evidence against Jordan, which arguably was all circumstantial.

Ultimately, however, it makes no difference, because the evidence was more than sufficient for the jury to reject the claim that Bates and Jordan were merely present, both as a matter of constitutional due process and under OCGA § 24-14-6. A defendant may be guilty of a crime if he directly commits the crime or if he is a "party thereto." OCGA § 16-2-20 (a). A party to a crime is one who, among other things, "aids or abets" in its commission or "advises, encourages, hires, counsels, or procures another to commit the crime." OCGA § 16-2-20 (b) (3)-(4). See also *Muse v. State*, 316 Ga. 639, 648 (2) (889 SE2d 885) (2023). To establish that a defendant is

a party to a crime, the State must show "proof of a shared criminal intent with the actual perpetrator." *Henderson*, 317 Ga. at 72 (2) (citation and punctuation omitted) (alterations accepted). That shared criminal intent may be inferred from the defendant's "presence, companionship, and conduct before, during, and after the offense." *Jones v. State*, 314 Ga. 214, 232 (3) (875 SE2d 737) (2022) (citation and punctuation omitted). But the defendant's mere presence at the crime scene, without more, is not enough to show a shared criminal intent. See *McCoy v. State*, 315 Ga. 536, 541 (b) (883 SE2d 740) (2023).

The evidence here authorized the jury to find that Bates and Jordan were guilty of Hagood's murder as parties to the crime and to reject the hypothesis that they were merely present at the scene. Besides the evidence recounted above, the cell-phone data showed that the co-defendants' phones moved together around the city before and after the crimes and stayed in communication throughout the day. The phones of Bates, Jordan, and Southern were all in contact in the morning. Jordan's and Southern's phones traveled

17

together from the area of their homes in Decatur to near Stone Mountain. Then those two phones and Willis's phone returned to Decatur and contacted Fortson's mother's phone near where Fortson lived. Later, the phones of Jordan, Southern, and Willis all made or received calls near the armed robbery and near the murder. See *Grier v. State*, 305 Ga. 882, 884 (1) (828 SE2d 304) (2019) (cell-phone records placing defendant near crime scene contributed to evidence authorizing guilty verdict). Still later, all the co-defendants' phones were active back in Decatur, near where several of them lived, in the same area where Hagood's stolen phone was used and where his stolen car was recovered. See *Carter v. State*, 305 Ga. 863, 867 (2) (828 SE2d 317) (2019) (circumstantial evidence of guilt included the location of the victim's phone after the victim's death).

Some of Bates's and Jordan's individual conduct also supported the inference of their guilt. Bates lied to police that he was texting when the crimes occurred, from which the jury could infer that he was trying to hide his own participation. And Jordan parked his car behind Hagood's car at the murder scene as though to prevent

Hagood from leaving, from which the jury could infer that Jordan knew a crime was about to be committed.

Given the ample evidence that Bates and Jordan shared a criminal intent with Southern and the other co-defendants, the jury could reject as unreasonable the claim that they were merely present at the crime scenes. See OCGA § 24-14-6; *Poole v. State*, 312 Ga. 515, 522-523 (863 SE2d 93) (2021). Because the jury's finding is not insupportable as a matter of law, we do not disturb it. See *Graves*, 306 Ga. at 487 (1).

Finally, Bates separately contends that the trial court erred by denying his motion for a directed verdict of acquittal. Because our standard for reviewing a direct-verdict motion is the same as that for reviewing the constitutional sufficiency of the evidence, see *Crawford v. State*, 312 Ga. 452, 454-455 (2) (863 SE2d 75) (2021), this claim likewise fails.

3. In Case No. S23A0881, Bates contends the trial court abused its discretion by denying his motion for mistrial after Detective Demeester testified about the statement Jordan gave to police. In

Bates's view, a portion of Jordan's statement violated Bates's Confrontation Clause rights under *Bruton*, because it was "powerfully incriminating" of Bates.

(a) While being questioned by the State, Detective Demeester testified that Jordan had implicated "the other subjects" in his statement:

> Q: [Jordan's counsel] asked you some questions about Mr. Jordan. Do you remember?
> A: Yes.
> Q: He asked you did Mr. Jordan put himself out [of] the car. Do you recall the question?
> A: Yes.
> Q: Okay. What role in this whole armed robbery in Cobb and murder in Fulton does Jordan put himself in?
> A: That he drove the other subjects to the location in Cobb County and then removed them from the robbery location after they robbed Mr. Smith and then was down on Fulton Industrial Boulevard with the other subjects when Mr. Hagood pulled up.

Bates's counsel immediately asked to make a motion outside the presence of the jury. When the jury had been excused, counsel moved for a mistrial, arguing that Demeester had mentioned "the other subjects," and the only "other subjects" were Jordan's co-defendants. See *Bruton*, 391 U.S. at 135-137 (recognizing that "powerfully

20

incriminating extrajudicial statements" by a non-testifying co-defendant can violate a defendant's right to confront witnesses against him).

The court decided that it would issue a curative instruction. Bates's counsel responded, "If the court is going to instruct the jury to disregard that, then we just need to move on from that point." The court then instructed the jury:

> You are to disregard the witness's answer. You are not to consider that in the evidence. And you are to disregard it completely.
> So anyway, we'll continue in a minute. But if you are unable to follow my instruction, please raise your hand.

No juror raised their hand, the trial continued, and Bates's counsel did not renew the motion for a mistrial.

(b) We do not reach Bates's *Bruton* claim because it was not preserved for appeal. To ensure appellate review of the denial of a motion for mistrial, a defendant generally must preserve the issue at trial. See *Jones v. State*, 317 Ga. 466, 472 (2) (893 SE2d 741) (2023). To do that, the defendant first must make a motion at the earliest opportunity in the trial court. See *Thomas v. State*, 310 Ga.

579, 581-582 (2) (853 SE2d 111) (2020) ("If the defendant did not make a contemporaneous motion for a mistrial at the time the defendant became aware of the matter giving rise to the motion, then the defendant has waived review of this issue on appeal.") (citation and punctuation omitted). If the trial court denies the motion, the error is preserved. See, e.g., *Richardson v. State*, 308 Ga. 70, 71 (2) (838 SE2d 759) (2020) (reviewing trial court's denial of mistrial on the merits where defendant "moved for a mistrial, which the trial court denied"). But if the trial court instead takes steps to cure the matter giving rise to the motion, like giving a curative instruction, the defendant has a choice: accept the curative instruction and move on, or object, renew the motion for mistrial, and obtain a definitive ruling on that motion. The denial of the mistrial motion is preserved for review only in the latter case—that is, by the renewal of the mistrial motion and a definitive ruling on that motion.[4] See *Hartsfield v. State*, 294 Ga. 883, 886 (2) (757 SE2d

_____

[4] The defendant's failure to preserve a mistrial motion for review does not necessarily mean that the underlying alleged error that was the basis of

90) (2014) (denial of mistrial waived for appeal because defendant "failed to renew his motion for mistrial following the trial court's admonishment and curative instruction"); *McCoy v. State*, 273 Ga. 568, 572 (8) (544 SE2d 709) (2001) (denial of mistrial waived for appeal because defendant "neither objected to the curative instruction nor renewed his motion for a mistrial").

Bates did not take the steps necessary to preserve his mistrial motion for appeal. He made a contemporaneous motion: as soon as Detective Demeester testified about Jordan mentioning "the other subjects," Bates asked for the jury to be excused and then moved for a mistrial. But when the trial court proposed issuing a curative instruction, Bates not only did not object to the instruction, but acquiesced: counsel said "If the court is going to instruct the jury to disregard that, then we just need to move on from that point." And Bates did not renew the motion for mistrial after the trial court

---

the mistrial motion cannot be reviewed. If the underlying alleged error was evidentiary in nature, it may be reviewed for plain error so long as the defendant raises it on appeal. See, e.g., *King v. State*, 316 Ga. 611, 618 (3) (c) (889 SE2d 851) (2023). Here, however, Bates argues on appeal only that the trial court abused its discretion in denying his mistrial motion.

23

issued the curative instruction. Having failed to object to the curative instruction and renew the motion for mistrial, Bates did not preserve the issue for appeal. See *Hartsfield*, 294 Ga. at 886 (2); *McCoy*, 273 Ga. at 572 (8). See also *Blackshear v. State*, 285 Ga. 619, 621 (4) (680 SE2d 850) (2009) (declining to review Confrontation Clause issue that was not properly preserved for appeal).

4. In Case No. S24A0055, Southern contends the trial court erred by instructing the jury on conspiracy over his objection.[5] We review de novo a properly preserved claim that a trial court gave an incorrect jury instruction. See *Reese v. State*, 314 Ga. 871, 879-880

---

[5] The trial court instructed the jury about conspiracy as follows:
A person commits conspiracy to commit a crime when that person together with one or more other persons conspires to commit any crime in any one or more of such person — and any one or more of such person does any overt act to bring about the object of the conspiracy.
A conspiracy is an agreement between two or more persons to do an unlawful act. And the existence of a conspiracy may be established by proof of acts and conduct as well as proof of an express agreement.
When persons associate themselves in an unlawful enterprise, any act done by any party to the conspiracy to further the unlawful enterprise is considered to be the act of all conspirators. However, each person is responsible for the acts of others only insofar as such acts are naturally and necessarily done to further the conspiracy. Whether or not a conspiracy existed in this case is a matter for you to determine.

(2) (880 SE2d 117) (2022).

A conspiracy instruction is authorized even if no defendant is charged with that offense, see OCGA § 16-4-8 (defining offense of conspiracy), so long as "slight evidence tends to show a conspiracy." *Brown v. State*, 304 Ga. 435, 441 (3) (819 SE2d 14) (2018). And a conspiracy can be shown by either an express agreement to commit a crime, see *Shepard v. State*, 300 Ga. 167, 170 (3) (794 SE2d 121) (2016), or a "tacit mutual understanding between persons to pursue a common criminal objective," *Wilson v. State*, 315 Ga. 728, 731 (2) (883 SE2d 802) (2023) (citation and punctuation omitted). The mutual understanding may be established either by direct proof or by inference from acts and conduct which "disclose a common design to act together for the accomplishment of the unlawful purpose." Id. (citation and punctuation omitted). Finally, "it is well established that presence, companionship[,] and conduct that discloses a common design before and after the offense are circumstances which may give rise to the existence of a conspiracy." *O'Neal v. State*, 316 Ga. 264, 269 (4) (888 SE2d 42) (2023) (citation and punctuation

25

omitted).

In light of this well-settled law on what evidence can establish a conspiracy, here there was slight—indeed, ample—evidence of a conspiracy between Southern and his co-defendants. The evidence showed that Southern and Bates confronted Hagood together while the other co-defendants waited nearby in two separate cars, and that after Southern shot Hagood, the co-defendants left together with Hagood's car and cell phone. And Southern was together with or in contact with the co-defendants throughout the day of the crimes. That was sufficient to support an inference that Southern and at least one of the other co-defendants had a mutual understanding that they would rob Hagood at gunpoint. See *O'Neal*, 316 Ga. at 270 (4) (not error to instruct jury about conspiracy when evidence was "sufficient to support the inference that O'Neal and at least one of the other men in the car had a mutual, if only tacit, agreement to lure [the victim] to meet with them under the guise of a drug transaction and then rob [the victim] of his money and/or phone"); *Smith v. State*, 306 Ga. 753, 758 (2) (833 SE2d 117) (2019) (not error

26

to instruct jury about conspiracy when evidence showed defendant and his co-defendants "rode together to the house in their gang territory where [the victim] was planning to sell drugs," "fled the scene together after robbing and shooting" the victim, and "communicated with each other and were together before, during, and after the crimes"). Because the evidence supported an inference that Southern and at least one of his co-defendants had a "common design to act together for the accomplishment of the unlawful purpose," *Wilson*, 315 Ga. at 731 (2) (citation and punctuation omitted), it was not error for the trial court to instruct the jury on the subject of conspiracy. See *O'Neal*, 316 Ga. at 270 (4); *Brown*, 304 Ga. at 441 (3).

5. Southern also contends that the trial court erred by admitting the testimony of the jailhouse informant, Seldon, over Southern's objection. In Southern's view, Seldon's testimony should have been suppressed because, when he and Bates spoke in the jail, Seldon was acting as an agent of the State and Bates did not have an attorney present, which violated Bates's right to counsel under

27

the Sixth Amendment to the United States Constitution. See

*Massiah v. United States*, 377 U.S. 201, 206 (84 SCt 1199, 12 LE2d

246) (1964).[6] In reviewing a trial court's denial of a motion to

suppress on Sixth Amendment grounds, we accept the trial court's

factual findings unless they are clearly erroneous, and we review de

novo the trial court's application of the law to the facts. See *Taylor*

---

[6] The State contends that this claim is not preserved for appeal because Southern did not object to Seldon's testimony on this specific ground at trial. But whether Southern preserved this claim is not so clear from the record here.

The State initially sought to introduce Seldon's testimony under the co-conspirator exception to the hearsay rule, as Seldon would testify that Bates asked him to "get rid of" a gun. See OCGA § 24-8-801 (d) (2) (E) (hearsay rule does not exclude a statement by a co-conspirator that is in furtherance of the conspiracy, including in the concealment phase). Then *Bates*—not Southern— moved to disqualify Seldon's testimony on the ground that Southern argues now—that is, that Seldon was acting as a State agent when he spoke with Bates. The trial court heard argument from Bates before trial, and denied that motion.

Separately, Southern argued before trial that the co-conspirator exception did not apply to Seldon's testimony because all the alleged co-conspirators were in custody when Bates made his hearsay statement. The trial court did not initially rule on Southern's argument. The next morning, the court heard further argument from Southern on the same issue, and at that point decided it would allow Seldon to testify. Southern's counsel responded, "For purposes of the record, Judge, we except."

In light of its context, Southern's objection could be understood as going only to the co-conspirator hearsay issue he had argued all along. But it could also be understood as a blanket objection that covered the ground Southern asserts here. Given this ambiguity, and because the issue on the merits is not particularly close, we assume without deciding that Southern preserved his claim for ordinary appellate review. See *Outlaw v. State*, 311 Ga. 396, 399 (2) (b) (858 SE2d 63) (2021).

*v. State*, 312 Ga. 1, 9 (3) (860 SE2d 470) (2021).

Southern's claim fails. Under *Massiah*, a defendant's Sixth Amendment right to the assistance of counsel "is violated by the admission of incriminating statements which a government agent deliberately elicits after indictment and in the absence of counsel." *Higuera-Hernandez v. State*, 289 Ga. 553, 554 (2) (714 SE2d 236) (2011). But an inmate who merely "acts upon the expectation of an unpromised reward does not thereby become an agent for the state." *Rai v. State*, 297 Ga. 472, 479 (3) (775 SE2d 129) (2015) (citation and punctuation omitted). Accord *Burgan v. State*, 258 Ga. 512, 515 (5) (371 SE2d 854) (1988). And that is all that Southern argues here: he claims only that Seldon is a "professional snitch" who has testified for the State several times before, and who obtains confidential information in jail with the intent of turning it over to the State to earn a sentence reduction. In other words, Southern argues that Seldon, at most, "acts upon the expectation of an unpromised reward." *Rai*, 297 Ga. at 479 (3) (citation and punctuation omitted). Absent an actual agreement between Seldon and the State to obtain

29

information on behalf of the State, see id. at 478-479, Southern cannot show that Seldon was an agent for the State, and so his claim fails.

*Judgments affirmed. All the Justices concur.*

Decided December 19, 2023.

Murder. Fulton Superior Court. Before Judge Krause.

*Charles H. Frier*, for appellant (case no. S23A0881).

*Melissa Akins*, for appellant (case no. S23A1225).

*Sharp Georgia Law Firm, Randall P. Sharp*, for appellant (case no. S24A0055).

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Mathew E. Plott, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General, M. Catherine Norman, Eric C. Peters, Assistant Attorneys General*, for appellee.