NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

# In the Supreme Court of Georgia

Decided: June 24, 2025

S25A0019. FULLER v. THE STATE.

LAGRUA, Justice.

Sonya Fuller appeals her conviction for felony murder predicated on aggravated assault, related to the fatal shooting of Anthony Reid.[1] On appeal, Fuller argues that we should reverse that

---

[1] Reid was killed on August 31, 2020. On March 12, 2021, a Spalding County grand jury indicted Fuller, her son Joshua Fuller, and other family members for various crimes related to Reid's death. As pertinent here, the grand jury indicted Fuller, individually and as a party to the crime, for the following counts: felony murder predicated on armed robbery (Count 1), armed robbery (Count 2), felony murder predicated on aggravated assault with intent to rob (Count 3), aggravated assault with intent to rob (Count 4), felony murder predicated on aggravated assault with a deadly weapon (Count 5), and aggravated assault with a deadly weapon (Count 6). Fuller was also charged with hindering the apprehension or punishment of a criminal (Count 9). In April 2022, Fuller and Joshua were jointly tried before a jury. The jury found Fuller guilty of felony murder predicated on aggravated assault with a deadly weapon and of aggravated assault (Counts 5 and 6), and of hindering the apprehension or punishment of a criminal (Count 9), and not guilty of Counts 1 through 4. The trial court sentenced Fuller to life in prison without possibility of parole for Count 5 and five years, to run consecutively, for Count 9. Count 6 merged into Count 5 for sentencing purposes. Fuller timely filed a motion for new trial on May 16, 2022, and amended the motion through new counsel on

conviction because (1) the evidence was not sufficient to convict her as a matter of constitutional due process, and (2) the trial court should have granted a directed verdict as to those charges. For the reasons that follow, we affirm Fuller's conviction.

Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that, in August 2020, Fuller, her son Joshua, and several other family members were living at a hotel in Spalding County, occupying "[t]hree to four [rooms] on any given day." The manager of the hotel testified that, on the night of August 31, he was standing "about 15 feet" away from Fuller's hotel room when he saw "a flash of somebody" wearing a gray hoodie "duck into the room," and then he heard "shouting and fighting and then there were two gunshots." The manager called 911, and as he hung up, Fuller called him and said that "somebody had been shot" and that "there was blood everywhere." The manager went to Fuller's room

May 11, 2023. The trial court heard the motion on September 25, 2023, denying it on December 13, 2023. Fuller timely filed a notice of appeal to the Court of Appeals, which transferred the matter to this Court on July 26, 2024. The case was docketed to the term of this Court beginning in December 2024 and submitted for a decision on the briefs.

and had to "force the door open" because Reid's body was blocking the door from the inside. The manager found Fuller and "another lady," later identified as Joshua's girlfriend, Rvaunte Frazer, in Fuller's room, "crying and screaming" "hysterical[ly]." The manager told them to go downstairs and wait for law enforcement officers, who arrived in about two minutes. The manager saw no evidence of a "forced entry" into Fuller's hotel room.

Law enforcement officers secured the scene, began interviewing witnesses, and reviewed hotel surveillance videos. The trial court admitted the surveillance videos into evidence at trial, and the State played several portions of those videos for the jury, from several different camera angles. The surveillance videos showed that, at 3:17 a.m., about ten minutes before the shooting, an individual wearing black and yellow sneakers—who was later identified as Joshua—was moving about the hotel. At 3:21 a.m., Frazer left Joshua's room, where they were both staying, and went to Fuller's room. At 3:26 a.m., less than one minute before the shooting, the surveillance videos showed an individual—who was

3

later identified as Joshua—wearing a gray and black hoodie and "those same . . . black and yellow shoes," exiting Joshua's room, heading toward Fuller's room. The manager's testimony and the surveillance videos indicate that Joshua entered Fuller's room without forcing entry, with Joshua's hands moving around his waistband in a manner consistent with drawing a gun as he entered her room. The surveillance videos recorded gunshots coming from Fuller's room about 20 seconds later. Joshua, Fuller, and Frazer remained in the room for about a minute, after which Joshua ran back to his own room. Fuller called the hotel manager to report the shooting about a minute after that.

About five minutes later, as law enforcement officers arrived on the scene, the surveillance videos showed Joshua leaving his room and moving about other family members' hotel rooms.[2] After canvassing the area and watching the surveillance videos, law enforcement officers arrested Joshua coming out of one of those

---

[2] Law enforcement officers found evidence related to the shooting in all the family members' rooms, including Fuller's, as discussed further below.

family members' hotel rooms.

When investigators spoke to Fuller immediately after the shooting, Fuller said that "someone came into the room and told them to give them all their stuff and that they were robbed."[3] Both Fuller and Frazer made statements to investigators that "an armed robbery occurred and that's how [Reid] got shot." Fuller did not tell investigators that Joshua was in her hotel room during the shooting, that Joshua shot Reid, or that Joshua shot Reid in self-defense.

Law enforcement officers found a pair of black and yellow bloodstained sneakers—like the sneakers Joshua was wearing in the surveillance videos—in one of the family members' hotel rooms. Law enforcement officers also found a gray and black hooded sweatshirt with blood on it in Joshua's hotel room, which was like the hooded sweatshirt Joshua was wearing in the surveillance videos. A GBI forensic DNA analyst testified that blood found on the

---

[3] Fuller's statement to law enforcement that an unknown assailant, not Joshua, committed an armed robbery and shot Reid, was the basis for her charge and conviction for hindering the apprehension or punishment of a criminal. At trial, Fuller conceded that she committed that crime, **«T5. 98»** and she does not challenge that conviction on appeal.

gray and black hooded sweatshirt matched Reid's DNA profile.

In Fuller's hotel room, law enforcement officers found a shell casing, which a GBI firearms examiner testified was fired from a gun found under one of the mattresses in Joshua's hotel room. A GBI microanalyst testified that Joshua's hands and the gray and black hooded sweatshirt found in his hotel room tested positive for gunshot residue. Law enforcement officers also found a single set of what appeared to be bloody shoeprints leading from Fuller's hotel room to the area in front of Joshua's hotel room and the hotel room next to his. Law enforcement officers did not find any other gun at the scene.

Law enforcement officers found a receipt in Reid's car showing that he had withdrawn about $5,500[4] from a bank three days before he died, but law enforcement found only $21 in Reid's wallet, which was still on Reid's person after the shooting. Law enforcement officers later found $1,425 in cash in Joshua's room and $3,211 in

---

[4] According to a bank receipt admitted into evidence, Reid withdrew $6,000 as a credit card cash advance, while simultaneously making a $485.36 "account deposit," leaving a total cash withdrawal of $5,514.64 **«T4. 57-58»**

6

cash on Joshua's person. Some of the money the officers found in Joshua's room was "banded" with rubber bands. Law enforcement officers also found several condoms in Fuller's room, and a law enforcement officer testified that the hotel where the shooting occurred was known for prostitution.

According to the medical examiner, Reid died from two gunshot wounds to the left thigh; one shot was "near the scrotum," and the other shot was a few inches from the first shot. Both shots were fired from an indeterminate range, and both shots exhibited a trajectory from Reid's "front to back" and "downward." The medical examiner also noted abrasions on Reid's knees that "could be consistent with carpet burn," and testified that, given their lack of healing, the abrasions were consistent with having been suffered within minutes to, at the "outer limit," hours before Reid's death.

1. Fuller was charged individually and as a party to the crimes of aggravated assault and felony murder. Fuller contends on appeal that the evidence was not sufficient to support the guilty verdicts for those crimes under *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781,

61 LE2d 560) (1979).[5] When we consider the constitutional sufficiency of the evidence pursuant to the standards set out in *Jackson* and its progeny, we consider the evidence "in the light most favorable to the verdict[s]," and we "evaluate whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which [s]he was convicted." *Davenport v. State*, 309 Ga. 385, 388 (1) (846 SE2d 83) (2020) (citation omitted). In so doing, we "put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." Id. (citation and punctuation omitted).

---

[5] Fuller does not challenge the sufficiency of the evidence pursuant to OCGA § 24-14-6, so we do not consider that statute here. See OCGA § 24-14-6 (providing that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused"). The dissent argues that the State did not present evidence making the inference of Fuller's guilt "any more likely than non-guilt inferences that could be drawn from the very same evidence." Dissent Op. at 9. But federal constitutional due process does not place the State "under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 326 (IV). It is sufficient for federal constitutional due process that the State presented evidence supporting a finding of Fuller's guilt beyond a reasonable doubt. Id.

8

"A person commits the offense of aggravated assault when he or she assaults . . . [w]ith a deadly weapon[.]" OCGA § 16-5-21 (a) (2). "A person commits the offense of murder when, in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (c). We conclude that the evidence was sufficient as a matter of constitutional due process for the jury to find Fuller guilty as a party to the crimes of aggravated assault and felony murder.

As a matter of statutory law, Fuller was a party to the aggravated assault and felony murder of Reid if she intentionally aided or abetted in the commission of the crimes, or intentionally advised, encouraged, counseled, or procured Joshua to commit the crimes. See OCGA § 16-2-20.[6] "Whether a person is a party to a

---

[6] The statute provides in full that:

(a) Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime.
(b) A person is concerned in the commission of a crime only if he:
    (1) Directly commits the crime;
    (2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not

9

crime may be inferred from that person's presence, companionship, and conduct before, during, and after the crime," and "where the crimes involve relatives with close relationships, slight circumstances can support the inference that the parties colluded." *Virger v. State*, 305 Ga. 281, 288 (3) (824 SE2d 346) (2019) (citations and punctuation omitted). Ultimately, the State must prove beyond a reasonable doubt that Fuller "shared a common criminal intent" with Joshua to commit aggravated assault and felony murder for her conviction to be upheld on a challenge of sufficiency as a matter of constitutional due process. *Fitts v. State*, 312 Ga. 134, 142 (3) (859 SE2d 79) (2021) (citation and punctuation omitted).

While the evidence of Fuller's guilt was not strong, a reasonable jury could infer that Fuller shared a common criminal

---

guilty of any crime either in fact or because of legal incapacity;
(3) Intentionally aids or abets in the commission of the crime; or
(4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

OCGA § 16-2-20.

10

intent with Joshua to lure Reid to Fuller's hotel room for the purpose of facilitating an armed robbery. This is because "slight circumstances can support the inference" of collusion among "relatives with close relationships" *Virger*, 305 Ga. at 288 (3) (citation and punctuation omitted). Here, Fuller lied to law enforcement officers about who fatally shot Reid. Construed most favorably to the verdicts, the jury could infer that Fuller lied to cover up not only Joshua's involvement in the attack but also her own.[7] See *Bates v. State*, 317 Ga. 809, 816 (2) (896 SE2d 581) (2023) (holding that a defendant's lie to police allowed the jury to "infer that he was trying to hide his own participation" as a party to murder); *Kim v. State*, 309 Ga. 612, 617 (1) (847 SE2d 546) (2020) (holding that the finder of fact "could reasonably infer" that the defendant

---

[7] At trial, Fuller's attorney conceded to the jury during closing argument that Fuller

> told a lie and said she did not know who it was, it was somebody else committed a robbery, came in and left. Objectively, that's a false statement. And she did it for her son. She knew it was her son. Somebody opened the door for him. But she did lie. So, when you get to Count 9 on hindering, I'm not going to belabor that point. She did that.
> **«T5. 98»**

11

"lied to the police because he shared a common criminal intent with his associate and that the two acted in concert in committing the crimes" of murder and other offenses) (citation omitted). Moreover, a reasonable jury could infer that Reid was visiting Fuller's hotel room for purposes of prostitution, because Reid had recently withdrawn a large sum of money from the bank, Fuller and Reid were in a hotel known for prostitution when the crimes occurred, and multiple condoms were found in Fuller's hotel room. A reasonable jury could also infer that Fuller knew that Reid was coming to Fuller's room with money to pay for prostitution services, so Fuller alerted Joshua for the purpose of robbing Reid. See *Fitts*, 312 Ga. at 143 (3) (concluding that the evidence authorized the jury to find a defendant guilty because that defendant knew of the victim's drug dealing and income tied to that business, was familiar with the burglarized home where the victim was killed, and gave a false name for the shooter to mislead investigators). Notably, some of the money that law enforcement officers found in Joshua's room was "banded," which would allow the jury to infer that the bills came

12

from Reid's bank.

And while there was no direct evidence that Fuller and Joshua planned to commit armed robbery together, the evidence allowed the jury to make that inference. This is because Fuller lied to law enforcement officers about who shot Reid and why, which allowed the jury to infer that she was covering her own participation in the crime, see *Bates,* 317 Ga. at 816 (2); *Kim,* 309 Ga. at 617 (1); because Joshua did not force entry into Fuller's room, suggesting that Fuller either left the door unlocked for Joshua or opened the door for him, see *Bates*, 317 Ga. at 816 (2) (concluding that the fact that a co-defendant parked his car behind the victim's car at the murder scene, "as though to prevent [the victim] from leaving," allowed the jury to infer that that co-defendant "knew a crime was about to be committed"); because the shooting occurred almost immediately after Joshua entered Fuller's room, allowing the inference that Fuller and Joshua had planned the attack; and because Fuller was present during the shooting, see *Golden v. State*, 310 Ga. 538, 541 (1) (852 SE2d 524) (2020) (concluding that the evidence, including

that the defendant "was present for the shooting," was sufficient as a matter of constitutional due process to convict the defendant as a party to the crime of murder).

As such, we conclude that the evidence was constitutionally sufficient for a rational jury to find Fuller guilty as a party to the crimes of aggravated assault and felony murder.

2. As for Fuller's final contention that the trial court erred in denying her motion for directed verdict, we note that our standard of review for a motion for directed verdict "is the same as that for reviewing the constitutional sufficiency of the evidence." *Bates*, 317 Ga. at 817 (2) (citation omitted). Because we concluded that the State's evidence was constitutionally sufficient to support Fuller's conviction, we likewise conclude that the evidence was sufficient for the trial court to deny Fuller's motion for directed verdict at trial. Id. Thus, this claim also fails.

*Judgment affirmed. Peterson, CJ, Ellington, McMillian, and Colvin, JJ, concur. Warren, PJ, and Bethel and Pinson, JJ dissent.*

PETERSON, Chief Justice, concurring.

I join the majority opinion in full because the evidence was sufficient to support Fuller's convictions as a matter of federal constitutional due process. But just barely.

I write to point out a different claim that, had Fuller raised it, may well have succeeded. When — as here — all of the evidence against a criminal defendant is circumstantial, a Georgia statute requires that for a conviction to be permissible, "the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. On this record, it does not appear to me that the State satisfied this requirement. One can easily — and reasonably — hypothesize that Fuller did not collude with her son, and instead simply covered for him after the fact because she is his mother.

But this statutory requirement is not a standard that we apply sua sponte; a defendant has to raise the issue. Fuller has not done

15

so in this appeal. And she cannot prevail on the issue she does raise. Accordingly, I join the majority opinion in affirming her conviction.

I am authorized to state that Justice Colvin joins this concurrence.

WARREN, Presiding Justice, dissenting.

Although this is a close case, I do not believe that the evidence presented at trial met the constitutional minimum required to safeguard Fuller's right to due process. Because I would therefore reverse Fuller's conviction for felony murder based on aggravated assault, I respectfully dissent.

The standard set out in *Jackson v. Virgina* instructs courts, in reviewing the sufficiency of the evidence to support a criminal conviction, to view the evidence presented at trial in the light most favorable to the verdicts and to defer to the jury's assessment of the weight of the evidence and its resolution of conflicting inferences that may be reasonably drawn from that evidence. See 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). This standard is extremely deferential, but it is not without limits. Constitutional due process requires that a defendant's criminal conviction rest on sufficient proof—"evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."

17

Id. at 316. "A 'reasonable doubt,' at a minimum, is one based upon 'reason,'" "'which arises from the evidence or lack of evidence'"; in this sense, a "'mere modicum'" of evidence cannot by itself rationally support a conviction beyond a reasonable doubt. Id. at 318, 320 & n.9 (citation omitted). If a jury finds a criminal defendant guilty "even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt," reversal of the conviction is required. Id. at 317. And that is so here.

In this case, the State was required to prove beyond a reasonable doubt that Fuller was at least a party to the crime of felony murder based on aggravated assault by shooting Reid. A person may be convicted as a party to the crime if she, among other things, "[i]ntentionally aids or abets" the commission of the crime or "[i]ntentionally advises, encourages, hires, counsels, or procures" another person to commit the crime. OCGA § 16-2-20 (b). "There must be some evidence showing that the defendant shared a common criminal intent to commit the crimes in question with the actual perpetrator[ ]." *Higuera-Guiterrez v. State*, 298 Ga. 41, 43

18

(779 SE2d 288) (2015). Common criminal intent may be inferred "from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes." *Clark v. State*, 315 Ga. 423, 427 (883 SE2d 317) (2023). But mere presence at the scene of a crime is not sufficient to make someone a party to a crime. See id. at 427-248. Even "[a]pproval of a criminal act, standing alone, does not rise to encouragement sufficient to establish that the defendant was a party to the crime." *Higuera-Guiterrez*, 298 Ga. at 43.

The State's apparent theory of the murder case against Fuller was that Fuller hatched a plan with her son, Joshua, to lure Reid to her hotel room with a promise of sex for money so that Joshua could then rob Reid. To be sure, the State presented some evidence from which it asked jurors to infer Fuller's guilt. But the State's evidence did not establish beyond a reasonable doubt that Fuller shared a common criminal intent to shoot Reid.

To begin, there was no direct evidence of Fuller's participation in the crimes—a point the majority opinion does not dispute. The

19

State presented no evidence that Fuller planned, knew about, participated in, or even encouraged Reid's shooting. It also did not present evidence that Fuller conspired with Joshua to lure Reid to her room so Joshua could rob or shoot him. Indeed, the State offered only speculation—not evidence—to explain how Reid ended up in Fuller's room, and presented no evidence indicating that Fuller communicated with Joshua in any way before or after the crimes. Nor was any physical evidence presented tying Fuller to the murder or to a robbery.

Left with only circumstantial evidence, the State presented a small constellation of data points from which it asked jurors to infer Fuller's guilt for felony murder: that the hotel Fuller stayed in was "known for prostitution"; there were several unopened condoms in her room; Reid had recently withdrawn a large sum of money from a bank; Joshua entered Fuller's room quickly, without attempting to force entry, and immediately shot Reid while Fuller was present; and Fuller later lied to investigators about Joshua's involvement in the crimes.

But the evidence produced by the State did not show the essential links between these facts and a common criminal intent to commit the crimes of which Fuller was found guilty. The evidence that Fuller stayed in a hotel that was "known for prostitution" and that she had unopened condoms in her room did not establish that Fuller was a prostitute (let alone that she lured Reid to her room with a promise of sex for money so that Joshua could rob or shoot him) and it would not be reasonable, without more, to make such inferences based on that evidence. As to the evidence that Reid had recently withdrawn a large sum of cash, the State presented no evidence whatsoever showing that Fuller knew Reid was in possession of any such money. The evidence supporting the State's theory that Joshua took cash from Reid—which included evidence of a bank withdrawal receipt in Reid's car days before the shooting, $21 in the wallet that was "still on Reid's person after the shooting," and "banded" money found in Joshua's room—was tenuous at best and failed to link Fuller to any criminal intent that could reasonably be inferred from this evidence. And it is noteworthy that the jury

21

found both Fuller and Joshua not guilty of armed robbery, aggravated assault with intent to rob, and felony murder based on those crimes. With respect to Joshua's entry into Fuller's room, the State presented no evidence that Fuller (rather than Reid or Joshua's girlfriend Rvaunte, who was also in the room) intentionally left the door unlocked, much less that Fuller did so as part of a set-up to allow Joshua to ambush and shoot Reid.

The strongest circumstantial evidence the State presented was that Fuller was present at the scene and that she later lied to investigators about Joshua's involvement in the shooting. As noted above, however, it is well settled that presence at a crime scene is not in itself enough to support a defendant's conviction as a party to a crime. See, e.g., *Clark*, 315 Ga. at 427-428. See also *Moore v. State*, 255 Ga. 519, 520-521 (340 SE2d 888) (1986) (reversing the defendant's murder conviction because the evidence presented at trial showed only "that he had a motive for the killing; that he was present during the killing; and that he fled thereafter," and was thus not sufficient as a matter of due process); *Brown v. State*, 250 Ga.

22

862, 864-865 (302 SE2d 347) (1983) (reversing the defendant's murder conviction because the evidence, which showed only that he was present at the crime scene with his brother (the shooter) and that he "participated in the act of bringing [a] shotgun and shells along," was not constitutionally sufficient). And Fuller's lies to law enforcement after the crimes were committed supported her conviction for hindering investigators' apprehension of Joshua (a conviction she does not challenge on appeal). See *Higuera-Guiterrez*, 298 Ga. at 42-44 (reversing the defendant's convictions for felony murder and other crimes because the evidence—which indicated that he lived near the crime scene and that after a shootout following an exchange of drugs, he retrieved drugs that had been left behind— was not sufficient to establish that he was a party to the crimes and instead showed, at best, that he was an accessory after the fact). Even viewed in the light most favorable to the verdicts and considered with the other evidence discussed above, that evidence would not authorize a rational jury to find Fuller guilty *beyond a reasonable doubt* as a party to the crime of felony murder. Compare,

e.g., *Bates v. State*, 317 Ga. 809, 813-816 (896 SE2d 581) (2023) (explaining that the evidence—which included not only that the defendant lied to the police but also that a witness identified him as one of the men who tried to rob the victim just before another co-defendant shot the victim, the defendant's phone was in communication with his co-defendants' phones before and after the crimes, and the defendant asked another person to "get rid of" a gun for him after the shooting—was constitutionally sufficient to support his convictions for felony murder and other crimes).

The beyond-a-reasonable-doubt standard plays a critical role in reaching this conclusion. Most of the individual pieces of circumstantial evidence detailed alone—such as Fuller's housing situation, the presence of unopened condoms in her room, the fact that her door was unlocked on the night of the crimes—were fairly innocuous. Even viewing the pieces of circumstantial evidence together and in the light most favorable to the guilty verdicts, the existence of so many different plausible explanations for the evidence the State introduced against Fuller undermines the notion

24

that rational jurors in this case could have concluded, beyond a reasonable doubt, that Fuller shared with Joshua a criminal intent to shoot Reid. Put another way, the State did not present any evidence that would make the inferences that would support Fuller's guilt (such as that she lied to cover up her own involvement in the murder) any more likely than non-guilt inferences that could be drawn from the very same evidence (such as that she lied only to cover up her son's involvement in the murder), leaving room for reasonable doubt. See *Jackson*, 443 U.S. at 318, 320 & n.9.

As I see it, the minimal evidence supporting a felony murder conviction did not prove beyond a reasonable doubt that Fuller shared a common criminal intent to shoot Reid. See *Jackson*, 443 U.S. at 318, 320 & n.9. Because, in my view, no rational juror could have determined Fuller's guilt beyond a reasonable doubt based on this evidence, I would conclude that the evidence was not sufficient as a matter of constitutional due process to support Fuller's conviction for felony murder and that as a result, that conviction should be reversed. See id. at 316-317; *Higuera-Guiterrez*, 298 Ga.

25

at 42-44; *Moore*, 255 Ga. at 520-521; *Brown*, 250 Ga. at 864-865.[8]

I am authorized to state that Justices Bethel and Pinson join in this dissent.

---

[8] Notably, this case is distinguishable from *Fitts v. State*, 312 Ga. 134 (859 SE2d 79) (2021), where we concluded that the evidence supporting the defendant's felony-murder conviction was sufficient as a matter of constitutional due process even where it was "far from overwhelming." Id. at 141. There, unlike here, the evidence showed that the defendant knew that there was drug dealing at the home where the victims (a woman and young child) lived; she made plans to meet the woman's boyfriend (with whom the defendant was having an affair) at the time the victims were robbed and shot; she called a participant in the robbery and shooting (whom she was also dating) several times before she met the woman's boyfriend; she helped the participant take a truck that was used in the shooting for repairs; she lied to investigators about the participant's name; she continued to contact the boyfriend to ask about the case but did not continue their affair; and she testified at trial that she was not involved in the crimes, providing an account that the jury was authorized to disbelieve. See id. at 143-144.

I also note that I agree with Chief Justice Peterson's assertion in his concurring opinion that if Fuller had raised a claim that the evidence presented at her trial did not satisfy OCGA § 24-14-6, it likely would have succeeded.